**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                                      Case No.: 6:12-bk-04736-CCJ
JOHN MICHAEL EDDY and                        Chapter 7
NANCY ELIZABETH EDDY,

        Debtors.

_____/

MARIE E. HENKEL, Chapter 7 Trustee,

        Plaintiff,

vs.                                                           Adv. No.: 6:13-ap-00115-CCJ

FRANK RAYMOND EDDY, JR.,
NANCY ELIZABETH EDDY,
THOMAS L. DEAN

        Defendant.

_____/

MARIE E. HENKEL, Chapter 7 Trustee,

        Plaintiff,

vs.                                                           Adv. No.: 6:13-ap-00112-CCJ

BROTHERS MILL, LTD.,

        Defendant.

_____/

## PLAINTIFF/TRUSTEE'S TRIAL MEMORANDUM

COMES NOW Marie E. Henkel, Plaintiff and Chapter 7 Trustee ("Plaintiff" or "Trustee"), pursuant to this Court's Order Scheduling Pretrial Conference and Final Evidentiary Hearing/Trial (13-ap-115, ECF No. 28 and 13-ap-112, ECF No. 34), and files this Trial Memorandum for the Trial scheduled for February 12, 13 and 14, 2014 and states as follows:

## A.  <u>FACTUAL BACKGROUND</u>

Frank Raymond Eddy, Jr. ("Ray") and the Debtor, John Michael Eddy ("Mike" or "Debtor") are brothers.  For many years prior to 2007, Ray and Mike (collectively the "Brothers") were partners in various business endeavors.  Their business ventures can be characterized to include the restaurant business, the home building business, and the sod business.  Each of the Brothers' various business interests were operated by the Brothers, jointly, under the umbrella entity The Eddy Corporation ("TEC").  At all pertinent times, Ray was the President of TEC.

### I.      <u>The Trust</u>

In or around 1982, the Brothers each created trusts into which their respective equity interests in TEC (8,000 shares) were transferred, together with certain other interests.  The Trustee of Mike's trust, named the John Michael Eddy Trust of 1982 (the "JME Trust"), was originally Thomas L. Dean.  However, the Trustee was, according to Mike, subsequently changed to Ray, thus making each Brother the trustee of the other Brother's trust.  Neither Ray, the acting Trustee of Mike's Trust, or Mike are aware of any amendment to the JME Trust ever being drafted or any formal action ever being taken, pursuant to the terms of the JME Trust, to make Ray the Trustee after the passing of Thomas L. Dean.

The named beneficiaries of the JME Trust were the Debtor's then spouse, Judith Cook Eddy, and his children, Tom and Sarah.  The JME Trust was deemed irrevocable at its creation, and Mike is neither a named beneficiary nor a trustee.  No loans are authorized by the terms of the JME Trust to be made to Mike under the JME Trust.

Ray as Trustee of Mike's Trust executed an "Authorization" dated December 12, 2007 which, by its terms, purported to authorize the JME Trust to "loan" money to Mike for purposes

of living expenses in any and all amounts sought by Mike, with Mike to "re-pay the loan to the [Trust] immediately upon receiving any funds."  None of the beneficiaries to the JME Trust executed any document authorizing any such withdrawals, nor was the JME Trust amended to so provide in any other lawful fashion.  By Mike's admission, none of the beneficiaries to either the JME Trust executed any document authorizing any such withdrawals, nor was the JME Trust amended to so provide in any other lawful fashion.

From December 12, 2007, through the Petition Date and post-petition, Mike has borrowed money from the JME Trust.  In December 2008, Mike executed a Promissory Note in the amount of $2,395,747.00 for debts he owed to the JME Trust.  In 2010, Mike executed an Amended and Restated Promissory Note for $2,467,804.00 for debts he owed the JME Trust.  In November, 2013, with knowledge that the Plaintiff was seeking to amend the adversary proceeding against the JME Trust to seek an injunction, Ray authorized the distribution of $65,000.00 from the JME Trust to Mike, which according to Ray was used to purchase Mike's home in Florida.

Although the JME Trust was created to be irrevocable, Mike has at all times (operating through Ray as trustee of the JME Trust) maintained control over the JME Trust and its assets, and has used the JME Trust assets for his personal benefit.   As a result, Mike has beneficial ownership of the JME Trust.

## II.     TEC and Brothers Mill

Over the years, both individually and through TEC, the Brothers acquired numerous assets, including interest in limited partnerships and limited liability companies, interests in some sixty-six (66) McDonald franchises, multiple Moe's sandwich shops, five (5) Goodyear Tire stores, bank stocks, and various land holdings and related interests.

However, despite their accumulated wealth, by December, 2007, TEC was virtually out of business.  The Brothers were, likewise, individually suffering financial depletion as a result of TEC's failure.  By then TEC was indebted to the Debtor, and his brother, Ray, in amounts in excess of $2,000,000.00 each, and TEC was likewise unable to meet the ongoing operating expenses apparently of it and its various affiliated and subsidiary entities.

Indeed, Ray claims that by mid-December, 2007, that he and Mike were unable to even pay their day-to-day living expenses as a result of the failing fortunes of TEC and its various subsidiary, affiliated and related entities.

As TEC and the Brothers' financial interests continued to deteriorate, Mike undertook a series of actions, in conjunction with Ray and others, in an attempt to insulate his remaining assets and income from the reach of his creditors.

Pursuant to the terms of an "Agreement" effective January 1, 2008 and executed by and among the Brothers and TEC, TEC distributed to the Brothers an undivided 50% interest in each of the following:

a.      100% of the equity interest of Eddy Sod, Inc.;

b.      A stock portfolio (stock's unnamed);

c.      300,000 shares of Chapman Technologies stock;

d.      10% of the equity interests of Command Medical Products, Inc.;

e.      46,000 shares of stock in Gateway Bank of Florida, with an option to purchase an additional 20,000 shares;

f.      20% of the equity interests in Eddy Properties, Ltd.;

g.      Promissory note from Welcome to Moe's to TEC;

h.      100% of TEC's equity interest in Riverbend Investment Group, Inc.;

     i.      A promissory note from David MacMaster;

     j.      450,000 shares of Goeken stock, and all preferred stock from the GGC conversion option;

     k.      20% of the equity interest of Saddle Ridge Farms, LLC;

     l.      20% of the equity interest in Saddle Ridge Farms II, LLC; and

     m.      A Chicago condominium.

The value of the assets distributed by TEC to Mike and his brother Ray was claimed to be not less than $4,045,763.00, as the distributions supposedly paid the debts, in full, that were then supposedly owing to Mike and his brother Ray. Those amounts were then subsequently reduced by an Amendment to the January 1, 2008 Agreement which was created in 2010, but was "effective as of January 1, 2008."

In July, 2010, the Brothers created a new entity, Brothers Mill, Ltd. ("Brothers Mill") with the help of L.A. Gornto, a self-proclaimed asset protection specialist.  Mike and Ray were the two principal members of Brothers Mill, owning a 49.5% limited partnership interest, each, and with TBM Management, LLC (general partner) owning the remaining 1% interest of which each brother owned half of the general partner.

After forming Brothers Mill, the Brothers transferred their respective 50% interest in TEC and a collection of assets into that entity.  Assets transferred by the Brothers to Brothers Mill, include the following:

     a.      46,000 shares of common stock of Gateway of Financial Holdings of Florida, Inc.;

     b.      50 shares of common stock of the Command Group, Inc.;

     c.      100% of the membership interest in TEC Homes, LLC;

    d.      100% of the equity interests of ETC Foods, LLC;

    e.      20% of the equity membership interest in Saddle Ridge Farms, LLC;

    f.      16.66% of the equity interest in Saddle Ridge Farms II, LLC;

    g.      A 20% general partnership interest and a 48% limited partnership in Eddy Properties, Ltd. with the other 32% being owned by Mike's Trust and the similar trust of Ray;

    h.      A $270,934.00 note from TEC to Ray;

    i.      A $58,948.35 note from TEC to Mike; and

    j.      A $70,250.00 note from Mike to Ray.

Thereafter, on or about October 10, 2010, Mike and Ray each executed an Amended and Restated Demand Promissory Note back dated to January 1, 2010, in favor of their respective trusts in the Debtor's instance, in the amount of $2,467,804.00.

Consequently, by the time the Brothers Mill transactions had concluded, Mike had transferred all, or substantially all, of his remaining assets to a supposedly separate legal entity (but over which Mike retained all control), and granted a security interest in his equity interest in that entity (Brothers Mill) as security in favor of the JME Trust for an alleged debt that had never before been secured, or paid, and was being controlled and used by Mike and Ray for their personal benefit.

According to a balance sheet of Brothers Mill dated December 31, 2011, Brothers Mill has an undisputed debt owing to Mike in the amount of $1,228,372.60 for a loan and such loan has not been repaid.

## B. **PLAINTIFF/TRUSTEE'S CLAIMS**

### I. **Trust Adversary Proceeding**

In the Trustee's adversary Proceeding against the JME Trust, the Trustee asks the Court to determine whether the JME Trust assets are Section 541 property of the estate, and if so, to order the turnover of the JME Trust assets to the Trustee.  It is the Trustee's position that although surfacely structured to appear as though not property of the estate (or subject to attachment by creditors), the JME Trust entity has become the alter ego of the Debtor, removing any protection and exposing the JME Trust assets to Mike's creditors and administration by the Trustee in this Chapter 7 case.

### a.  Piercing the JME Trust

The most illustrative and instructive cases in this regard are a line of tax cases.  These cases, discussed below, support the proposition that an alter ego analysis should be applied where a trust has been created or used with the intent to defraud creditors, or with a complete disregard for the trust formalities, leaving the settlor in full control of the trust assets.

In the case of In re Schwarzkopf, the Chapter 7 trustee of debtors' bankruptcy estate sought to recover for the estates' benefit approximately $4,000,000 in assets the Chapter 7 trustee alleged were fraudulently transferred to two irrevocable trusts. 626 F.3d 1032 (9th Cir. 2010). The Bankruptcy Court ruled that one of the trusts was debtor's alter ego, but that the other trust was valid.  Id.  Appeal was taken and the Ninth Circuit found that both trusts were the alter ego of debtor.   Id.  In Schwarzkopf, the Court states that it is well-settled that a trust created for the purpose of defrauding creditors, or other persons, is illegal and may be disregarded.  Id. at 1037.

Other cases have similarly allowed for the "piercing" of a trust where the elements of alter ego are met.  See U.S. v. Bahrs, 2006 WL 2507574 (N.D. Fla. 2006); Otero v. Vito, 2009 WL 3063426 (M.D. Ga. 2009); U.S. v. Spiwak, 1995 WL 867855 (S.D. Fla. 1995).

Each of the above cases cite to the Eleventh Circuit Court of Appeals case, Shades Ridge

Holding Company, Inc. v. U.S., and apply the reasoning of Shades Ridge to trusts.  888 F. 2d

725 (11th Cir. 1989).  In Shades Ridge the Court found that the property of the nominee or alter

ego of a taxpayer is subject to collection of the taxpayer's tax liability.  Id. at 728, 729.

Whether a corporation or trust is a nominee turns on: (1) the control exercised over the

nominee and its assets; (2) the use of corporate or trust funds to pay personal expenses; and (3)

the family relationship, if any, between the debtor and the corporate or trust officers.  Id. at 729.

Reason dictates that a similar analysis as in the above cited cases should be used in this

matter, but with an application of Florida alter ego law.  The IRS, absent unique circumstances,

stands like any other creditor, and there is no basis for regarding its ability to pierce a trust as a

nominee or alter ego any differently than another creditor or Chapter 7 trustee, nor do any of the

cited cases suggest that there is.

In the case at bar, though perhaps not intended at the time of the JME Trust's creation,

the Debtor has exercised control over the JME Trust and its assets as a result of Debtor's

deteriorating financial condition.  Though the settlor of the JME Trust, and not a beneficiary, the

Debtor has removed stock from the JME Trust, had the JME Trust issue him a loan in an amount

exceeding $2,000,000.00, and as recently as November, 2013 took $65,000.00 from the JME

Trust for the purchase of his Florida home.  Mike has been able to do all of this, because he has a

close familial relationship with the Trustee of the JME Trust, his brother Ray.  In fact, both Mike

and Ray have acknowledged that there is little formality to Ray's duties to the JME Trust and

that Ray in many circumstances is unaware of what monies distributed by him from the JME

Trust are used for by Mike.

### b.  Alter Ego Under Florida Law

The facts illustrate that the JME Trust should be regarded as the alter ego of Debtor and

pierced by the trustee in this case.  Under Florida law, to prove that a corporation is an alter ego

of an individual the Court analyzes:

1. whether the corporation was dominated and controlled in such a way that it was in essence merely an alter ego, used for personal benefit (corporations independent existence was in fact nonexistent);
2. whether some sort of improper conduct in either the formation or the use of the corporate form occurred; and
3. whether the improper conduct imposed an injury on the plaintiff.

Mullin v. Dzikowski, 257 B.R. 356 (S.D. Fla. 2000); Dania Jai-Alai Palace, Inc. v. Sykes, 450

So. 2d 1114 (Fla. 1984); Keys Jeep Eagle, Inc. v. Chrysler Corp., 897 F. Supp. 1437 (S.D. Fla.

1995), aff'd, 102 F.3d 554 (11th Cir. 1996).

Here, as previously outlined, Mike has dominated and controlled the JME Trust and used

the assets of the same for his own personal benefit.  While an independent existence may have at

one time been intended, the Debtor has utterly disregarded the JME Trust's independence over

the past few years and treated it as nothing more than a bank account, which he has his brother

Ray administer.  By doing so, the Debtor has made available to himself (and actually used) assets

that are allegedly untouchable by his creditors.

## II.  The Brothers Mill Adversary Proceeding

The Trustee asserts four counts in the Brothers Mill Adversary Proceeding:

I.    Turnover under Section 542 of the Bankruptcy Code;
II.   Fraudulent Transfer under Section 548 of the Bankruptcy Code;
III.  Recovery of Fraudulently Transferred Funds under Section 550 of the Bankruptcy Code; and
IV.   Injunction under Section 105 of the Bankruptcy Code.

### a.  Turnover Under Section 542 of the Bankruptcy Code

According to a balance sheet of Brothers Mill dated December 31, 2011, Brothers Mill

has an undisputed, matured debt owing to the Debtor in the amount of $1,228,372.60 for a loan,

and such loan has not been repaid.  The same debt is listed in Brothers Mill Balance Sheet for

December 31, 2010.  It is also identified in Brothers Mill's 2010, 2011 and 2012 Form 1065, U.S. Return of Partnership Income.  The existence of this debt creates an interest in the property at issue (the $1,228,372.60) in favor of the Debtor, which entitles the Trustee to either turnover of the funds being held by Brothers Mill, or a money judgment in Trustee's favor.

Under Section 542(b) of the United States Bankruptcy Code, "an entity that owes a debt to the debtor that is property of the estate and that is matured, payable on demand, or payable on order" must turn over the property to the Chapter 7 trustee.  *See* In re American Fabricators, Inc., 197 B.R. 987, 996 (Bankr. M.D. Fla. 1196).  The only exception to turnover under Section 542 is where the debt is in dispute, or there is a right to offset.  *See* 11 U.S.C. § 542(b); In re Ven-Mar Intern., Inc., 166 B.R. 191, 191 (Bankr. S.D. Fla. 1994).

In the instant action, the Defendant, Brothers Mill, has issued only a general denial to the allegation that the $1,228,372.60 debt is property of the Debtor's Estate, and has not raised any affirmative defenses or counterclaims in that regard (ECF No. 13).  Brothers Mill in response to the allegation regarding the listing of the debt as a matured debt within the balance sheet, claimed to lack knowledge of its own financial records (ECF No. 13).  Brothers Mill has not produced any evidence to support that the debt is not matured or payable on demand.  Nor has Brothers Mill been able to produce any note or other document which would establish that the debt is not currently due and payable.  All that Brothers Mill has relied on in opposition to this claim, is Debtor's word that the money he lent (within two years of bankruptcy) to the newly formed (within two years of bankruptcy) Brothers Mill, over which he maintains authority and control, is not yet payable.

### b.  Fraudulent Transfer Under Section 548 of the Bankruptcy Code

Under Section 548 of the United States Bankruptcy Code, a transfer may be avoided

where there is an actual or constructive intent to hinder, delay or defraud a creditor. In determining fraudulent intent the non-exhaustive list of badges of fraud that the Court may consider are:

(1) lack or inadequacy of consideration;
(2) existence of a family, friendship, or other close relationship between debtor and transferee;
(3) debtor's retention of possession, control, benefits or use of the property in question following transfer;
(4) financial condition of debtor both before and after transfer took place;
(5) cumulative effect of transactions and debtor's course of conduct after the onset of financial difficulties or dependency or threat of suit by creditors; and
(6) general chronology and timing of transfer in question.

*See* In re Khanani, 374 B.R. 878 (Bankr. M.D. Fla. 2005).

Pursuant to the terms of the "Agreement" and the "Amendment" executed by and among the Brothers and TEC and made effective January 1, 2008, around the time TEC was failing and the Brothers were likewise facing financial difficulty, TEC distributed to the Brothers, individually, an undivided 50% interest in various assets that the Brothers valued at not less than $4,045,763.00. The Brothers then created Brothers Mill in July, 2010, less than two years prior to filing the bankruptcy petition and immediately transferred all of the TEC assets being held individually by them, as well as a collection of other assets, into Brothers Mill for no apparent consideration. As evidenced by Brothers Mill's Balance Sheets the Debtor also made a loan to Brothers Mill in the amount of $1,228,372.60, again, within two years of Debtor's bankruptcy filing. The final hurdle created for creditors was the UCC-1 financial statements, which were recorded to allegedly secure the debt. L.A. Gornto, a self-proclaimed asset protection specialist, aided and abetted the Brothers with these transactions.

At the time that Brothers Mill was created and the transfers were made, the Debtor was already insolvent, and was feeling the pressure of creditors. Mike, a sophisticated businessman,

understood the implications of the parties' deteriorating financial condition, and strategically sought out advice on how to protect his assets, deeming his actions "estate planning."    However, in the more than a decade prior to facing financial turmoil, when the Brothers were swimming in prosperity, the only estate planning that Debtor had engaged in was the creation of a will and the JME Trust, which by 2008 the Debtor began disregarding the formalities of and looted the same to the same to the tune of $2,000,000.

Neither Brothers Mill nor Mike have denied that the transfers to Brothers Mill occurred. In defense of the Trustee's claim, Brothers Mill has simply recited, in conclusory fashion, standard defenses to Section 548 claims like "reasonably equivalent value."    No evidence supporting any consideration for the transfers, of ordinary course, or any of Brothers Mill's other defenses has been presented by Mike or Ray.

### III. Trustee's Objection to Northern Trust IRA Claim of Exemption

The Debtor has claimed as exempt all monies held within his Northern Trust IRA (the "IRA").    The Trustee objects to the Debtor's claim of exemption on the grounds that Debtor's transfer of funds into the IRA should have been paid back to the JME Trust, and that funds withdrawn from the IRA were not paid back to the JME Trust.    The Trustee asserts that the there has been a deliberate effort by the Debtor to keep the funds out of the JME Trust, which Debtor understood may be exposed as a result of his personal use.

#### a.    Florida Statute § 222.29

Typically, funds in an IRA are exempt.    However, under Florida Statute Section 222.29, an exemption from attachment or legal process is not effective if it results from a fraudulent transfer or conveyance as provided in Chapter 726.

In the case of In re Hendricks, the court commented on Florida Statute Section 222.29 as

follows: "[b]y its language, § 222.29 clearly prohibits debtors from taking advantage of Florida's liberal exemptions when they fraudulently convert non-exempt assets into exempt assets, and with this in mind, Florida courts have not hesitated to deny debtors exemptions for life insurance policies, annuities, and other miscellaneous assets." 237 B.R. 821, 825 (Bankr.M.D.Fla.1999).

Here, the Debtor's Schedule J indicates that the Debtor continues to fund money into the IRA without necessity and when the money should have been used to repay the JME Trust, under the Authorization executed in 2007.

**b.  Florida Statute § 222.30**

The transfers in this case to the IRA may likewise be avoided by Florida Statute Section 222.30.  Under Florida Statute Section 222.30, "[a]ny conversion by a debtor of an asset that results in the proceeds of the asset becoming exempt by law from the claims of a creditor of the debtor is a fraudulent asset conversion as to the creditor, whether the creditor's claim to the asset arose before or after the conversion of the asset, if the debtor made the conversion with the intent to hinder, delay, or defraud the creditor" (emphasis added).

As used in Florida Statute 222.30 "conversion" means every mode, direct or indirect, absolute or conditional, of changing or disposing of an asset such that the product or proceeds of the asset become immune or exempt by law from claims of creditors of the debtor, and the products or proceeds of the asset remain property of the debtor.

The Trustee asserts that the Debtor was aware that his use of the JME Trust as a "piggy bank" was unlawful, or at a minimum he understood that his actions toward the JME Trust jeopardized the irrevocable nature of the JME Trust.  With an understanding that his actions could potentially result in the JME Trust being extinguished, thus, exposing the assets therein to attachment by his creditors, the Debtor ignored the requirement under the "Authorization"

executed in 2007 to immediately repay funds taken from the JME Trust and instead placed that money into the IRA to insulate the monies from his creditors.

The Debtor chose to systematically withhold funds that should have been used to repay the JME Trust for "loans" into the IRA.   The Debtor took withdrawals From the IRA, but has never repaid the JME Trust with those washed funds.  This shows Mike's calculated fraudulent intent.

As with any fraudulent transfer/conveyance action, this Court must take into consideration the (non-exhaustive) list of badges of fraud when evaluting the Trustee's claim; and, each of those factors support the Trustee's objection.  *See* Fla. Stat. § 726.105(2); In re Jennings, 332 B.R. 465 (Bankr. M.D. Fla. 2005).

The language of Florida Statute 726.105(2) makes clear that the badges of fraud are nonexclusive and that courts may consider other factors in determining a debtor's intent. In re Stewart, 280 B.R. 268, 279 (Bankr. M.D. Fla. 2001). "In addition, courts take into account 'the particular facts surrounding the conveyance,' and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor." General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1498–99 (11th Cir.1997) (*quoting Kirk v. Edinger*, 380 So.2d 1336, 1337 (Fla. 5th Dist.Ct.App.1980)).

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff/Trustee's Trial Memorandum was served via CM/ECF and/or by U.S. First Class Mail postage prepaid to the following on January 30, 2014.

Scott W. Spradley, Esquire, Law Offices of Scott W. Spradley, PA, 109 South 5th Street, P.O. Box 1, Flagler Beach, FL 32136;
Marie E. Henkel, Trustee, 3560 S. Magnolia Avenue, Orlando, FL 32806.


*/s/ Richard B. Webber, II*
_____
Richard Blackstone Webber, II, Esquire
Florida Bar No.: 0608394
ZIMMERMAN, KISER & SUTCLIFFE, P.A.
315 E. Robinson St., Suite 600 (32801)
P.O. Box 3000
Orlando, FL 32802
Telephone: (407) 425-7010
Facsimile: (407) 425-2747
Counsel for Chapter 7 Trustee
rwebber@zkslawfirm.com

## APPENDIX TO PLAINTIFF/TRUSTEE'S TRIAL MEMORANDUM

1. In re Khanani, 374 B.R. 878 (Bankr. M.D. Fla. 2005)

2. Florida Statute Section 222.30

3. In re Schwarzkopf,  626 F.3d 1032 (9th Cir. 2010)

4. In re Shades Ridge,  888 F. 2d 725 (11th Cir. 1989)

Page 1

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

**C**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.
In re Mohammed Owais KHANANI, Debtor.
Leigh R. Meininger, Trustee, Plaintiff,
v.
Mohammed Owais Khanani, Defendant.

Bankruptcy No. 6:04–BK–07648–ABB.
Adversary No. 6:04–ap–00212–ABB.
Sept. 27, 2005.

**Background:** Chapter 7 trustee brought adversary proceeding to deny debtor's discharge based on his alleged failure to keep or preserve adequate financial records and on his false oaths.

**Holdings:** The Bankruptcy Court, Arthur B. Briskman, J., held that:
(1) trustee satisfied initial burden of showing that debtor's financial records were inadequate;
(2) debtor did not satisfactorily explain his failure, in response to request by trustee for bank and credit card statements, tax returns, tax withholding forms, deeds and property transfer documents, to produce anything more that one bank statement and several account numbers; and
(3) debtor's false representations or omissions on statement of financial affairs and bankruptcy schedules were done with requisite fraudulent intent.

Judgment for trustee.

West Headnotes

**[1] Bankruptcy 51 ⟾3022**

51 Bankruptcy
    51IX Administration
        51IX(A) In General
            51k3022 k. Debtor's Duties in General.
Most Cited Cases

Fundamental obligation of debtor who seeks bankruptcy protection is to be forthright with court, creditors and trustee.

**[2] Bankruptcy 51 ⟾3278.1**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)1 In General
                51k3278 Failure to Keep Records
                    51k3278.1 k. In General. Most Cited Cases

Purpose of "recordkeeping" discharge exception is to make certain that creditors and trustee are given sufficient information to understand debtor's financial condition. 11 U.S.C.A. § 727(a)(3).

**[3] Bankruptcy 51 ⟾3279**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)1 In General
                51k3278 Failure to Keep Records
                    51k3279 k. Sufficiency of Records.
Most Cited Cases

To satisfy his obligation under "recordkeeping" discharge exception to keep and preserve "sufficient" financial records, the records that debtor produces must enable his creditors to ascertain his present financial condition and to follow his business transactions for reasonable period of time in past. 11 U.S.C.A. § 727(a)(3).

**[4] Bankruptcy 51 ⟾3315(2)**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)2 Determination of Dischargeability
                51k3314 Evidence
                    51k3315 Presumptions and Burden

APPENDIX
1

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

of Proof

51k3315(2) k. Particular Grounds for Objection to Discharge. Most Cited Cases

Trustee objecting to debtor's discharge under "recordkeeping" discharge exception bears initial burden of showing reasonable grounds to believe that debtor's books or records are inadequate, as well as ultimate burden of showing that debtor is not entitled to discharge. 11 U.S.C.A. § 727(a)(3).

**[5] Bankruptcy 51 ☞3317(6)**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
        51X(B)2 Determination of Dischargeability
      51k3314 Evidence
      51k3317 Weight and Sufficiency for Objection to Discharge
        51k3317(6) k. Records, Matters Relating To. Most Cited Cases

Standard of proof, in proceeding to deny debtor a discharge based on his failure to keep or preserve sufficient financial records, is proof by preponderance of evidence. 11 U.S.C.A. § 727(a)(3).

**[6] Bankruptcy 51 ☞3279**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
      51k3278 Failure to Keep Records
        51k3279 k. Sufficiency of Records. Most Cited Cases

"Recordkeeping" discharge exception does not require a full accounting of every business transaction of debtor; however, there should be some written records, orderly made and preserved, from which the present and past financial condition of debtor may be ascertained with substantial completeness and accuracy. 11 U.S.C.A. §

727(a)(3).

**[7] Bankruptcy 51 ☞3279**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
      51k3278 Failure to Keep Records
        51k3279 k. Sufficiency of Records.
Most Cited Cases

Whether debtor has kept and preserved "sufficient" financial records, as required for him to obtain a discharge, must be determined based on facts of each case. 11 U.S.C.A. § 727(a)(3).

**[8] Bankruptcy 51 ☞3279**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
      51k3278 Failure to Keep Records
        51k3279 k. Sufficiency of Records.
Most Cited Cases

Debtor who is involved in business may be held to more stringent standard, under "recordkeeping" discharge exception, than that imposed on debtor who is unsophisticated wage earner. 11 U.S.C.A. § 727(a)(3).

**[9] Bankruptcy 51 ☞3315(2)**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
        51X(B)2 Determination of Dischargeability
      51k3314 Evidence
        51k3315 Presumptions and Burden of Proof
        51k3315(2) k. Particular Grounds for Objection to Discharge. Most Cited Cases

Once party objecting to debtor's discharge under "recordkeeping" discharge exception makes

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

an initial showing that debtor failed to keep or preserve adequate records from which his financial condition or business transactions might be ascertained, burden then shifts to debtor to explain satisfactorily this loss of records. 11 U.S.C.A. § 727(a)(3).

**[10] Bankruptcy 51 ⬅3280**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
        51k3278 Failure to Keep Records
          51k3280 k. Justification. Most Cited Cases

To satisfactorily explain, for purposes of obtaining bankruptcy discharge, a loss of records from which his financial condition or business transactions might be ascertained, debtor must explain this loss or deficiency of documentation in such a manner to convince court of his good faith and businesslike conduct. 11 U.S.C.A. § 727(a)(3).

**[11] Bankruptcy 51 ⬅3279**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
        51k3278 Failure to Keep Records
          51k3279 k. Sufficiency of Records. Most Cited Cases

In proceeding to deny Chapter 7 debtor a discharge under "recordkeeping" discharge exception, trustee satisfied initial burden of showing that debtor's financial records were inadequate, where debtor, an experienced businessman who had been involved in 20 different business ventures within six years of petition date, produced only one bank statement and some account numbers, but no other records, despite request by trustee for bank and credit card statements, tax returns, tax withholding forms, deeds and property transfer documents. 11 U.S.C.A. § 727(a)(3).

**[12] Bankruptcy 51 ⬅3280**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
        51k3278 Failure to Keep Records
          51k3280 k. Justification. Most Cited Cases

Chapter 7 debtor did not satisfactorily explain his failure, in response to request by trustee for bank and credit card statements, tax returns, tax withholding forms, deeds and property transfer documents, to produce anything more that one bank statement and several account numbers, simply by testifying that he could not afford cost of obtaining such documentation from third party. 11 U.S.C.A. § 727(a)(3).

**[13] Bankruptcy 51 ⬅3280**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
        51k3278 Failure to Keep Records
          51k3280 k. Justification. Most Cited Cases

Chapter 7 debtor did not satisfactorily explain his failure, in response to request by trustee for bank and credit card statements, tax returns, tax withholding forms, deeds and property transfer documents, to produce anything more that one bank statement and several account numbers, based upon testimony that he had lost relevant documents to landlord on being evicted from certain property; debtor's testimony was inconsistent with representation on his statement of financial affairs that none of his records were in possession of third party, and debtor presented no evidence of any attempt to retrieve alleged records from landlord. 11 U.S.C.A. § 727(a)(3).

**[14] Bankruptcy 51 ⬅3279**

51 Bankruptcy

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

51X Discharge
  51X(B) Dischargeable Debtors
    51X(B)1 In General
      51k3278 Failure to Keep Records
        51k3279 k. Sufficiency of Records.
Most Cited Cases

Chapter 7 debtor, as experienced businessman who had been involved in 20 different business ventures within six years of petition date, had to be held to higher standard of care than unsophisticated wage earner, for purpose of deciding whether he should be denied a discharge based upon inadequacy of his financial records. 11 U.S.C.A. § 727(a)(3).

**[15] Bankruptcy 51 ☞3315(2)**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)2 Determination of Dischargeability
        51k3314 Evidence
          51k3315 Presumptions and Burden of Proof
            51k3315(2) k. Particular Grounds for Objection to Discharge. Most Cited Cases

**Bankruptcy 51 ☞3317(7)**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)2 Determination of Dischargeability
        51k3314 Evidence
          51k3317 Weight and Sufficiency
            51k3317(2) Particular Grounds for Objection to Discharge
              51k3317(7) k. False Oath or Account. Most Cited Cases

Burden of proof is on party objecting to debtor's discharge based on his alleged false oaths or accounts, and party must carry that burden by preponderance of evidence. 11 U.S.C.A. §

727(a)(4)(A).

**[16] Bankruptcy 51 ☞3274**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
        51k3273 Grounds for Denial of Discharge
          51k3274 k. Intent. Most Cited Cases

**Bankruptcy 51 ☞3282.1**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)1 In General
        51k3282 False Oath or Account
          51k3282.1 k. In General. Most Cited Cases

To prevail on complaint to deny debtor a discharge based on his false oath(s), complainant must show that debtor made false oath knowingly and fraudulently. 11 U.S.C.A. § 727(a)(4)(A).

**[17] Bankruptcy 51 ☞3315(2)**

51 Bankruptcy
  51X Discharge
    51X(B) Dischargeable Debtors
      51X(B)2 Determination of Dischargeability
        51k3314 Evidence
          51k3315 Presumptions and Burden of Proof
            51k3315(2) k. Particular Grounds for Objection to Discharge. Most Cited Cases

Fraudulent intent, of kind required to deny debtor a discharge based on his false oath(s), may be established through inference from facts. 11 U.S.C.A. § 727(a)(4)(A).

**[18] Bankruptcy 51 ☞3282.1**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)1 In General
                51k3282 False Oath or Account
                    51k3282.1 k. In General. Most Cited Cases

False oath is considered "material," for denial-of-discharge purposes, if it bears a relationship to debtor's business transactions or estate or concerns discovery of assets, business dealings, or existence and disposition of his property. 11 U.S.C.A. § 727(a)(4)(A).

**[19] Bankruptcy 51 ⇌3274**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)1 In General
                51k3273 Grounds for Denial of Discharge
                    51k3274 k. Intent. Most Cited Cases

It is irrelevant, in proceeding to deny debtor a discharge based upon his false oath(s), that debtor did not intend to injure his creditors when he made false statement; intent to injure is not prerequisite to denial of discharge based on debtor's false oath(s). 11 U.S.C.A. § 727(a)(4)(A).

**[20] Bankruptcy 51 ⇌2322**

51 Bankruptcy
    51III The Case
        51III(F) Schedules and Statement of Affairs
            51k2322 k. Requisites in General. Most Cited Cases

**Bankruptcy 51 ⇌3022**

51 Bankruptcy
    51IX Administration
        51IX(A) In General
            51k3022 k. Debtor's Duties in General. Most Cited Cases

Debtor has paramount duty to consider all questions posed on bankruptcy statements or schedules carefully and to see that questions are answered completely in all respects.

**[21] Bankruptcy 51 ⇌2321**

51 Bankruptcy
    51III The Case
        51III(F) Schedules and Statement of Affairs
            51k2321 k. In General. Most Cited Cases

In answering questions posed on bankruptcy statements or schedules, it is not job of debtor to determine which questions are relevant or material.

**[22] Bankruptcy 51 ⇌3315(2)**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)2 Determination of Dischargeability
                51k3314 Evidence
                    51k3315 Presumptions and Burden of Proof
                        51k3315(2) k. Particular Grounds for Objection to Discharge. Most Cited Cases

Inference that false oath was intentionally made may be drawn, for denial-of-discharge purposes, from circumstance surrounding debtor. 11 U.S.C.A. § 727(a)(4)(A).

**[23] Bankruptcy 51 ⇌3274**

51 Bankruptcy
    51X Discharge
        51X(B) Dischargeable Debtors
            51X(B)1 In General
                51k3273 Grounds for Denial of Discharge
                    51k3274 k. Intent. Most Cited Cases

**Bankruptcy 51 ⇌3284**

51 Bankruptcy

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

   51X Discharge
     51X(B) Dischargeable Debtors
      51X(B)1 In General
       51k3282 False Oath or Account
         51k3284 k. Errors on and
Omissions from Schedules. Most Cited Cases

Chapter 7 debtor's false representations on statement of financial affairs, in initially indicating that he had not transferred any property prepetition and in subsequently indicating, in amendment filed after questioning as to deed that debtor executed prepetition, that transfer was not to relative of debtor, were made with requisite fraudulent intent, and supported denial of debtor's discharge based upon his false oaths, based, inter alia, upon fact that transfer was the subject of two prepetition depositions of debtor, that deed was recorded just 25 days prepetition, that debtor was sophisticated businessman with prior experience in bankruptcy, and that debtor was not surprised that address for transferee was mailbox rented by his sister. 11 U.S.C.A. § 727(a)(4)(A).

**[24] Bankruptcy 51 ☞3315(2)**

51 Bankruptcy
   51X Discharge
     51X(B) Dischargeable Debtors
      51X(B)2 Determination of Dischargeability
       51k3314 Evidence
        51k3315 Presumptions and Burden of Proof
         51k3315(2) k. Particular Grounds for Objection to Discharge. Most Cited Cases

Among common badges of fraud, from which inference can be drawn that debtor acted with fraudulent intent in transferring property or in failing to disclose transfer on bankruptcy statements or schedules, are as follows: (1) lack or inadequacy of consideration for property transferred; (2) existence of family, friendship or other close relationship between debtor-transferor and transferee; (3) debtor-transferor's retention of

possession, control, benefits or use of property in question; (4) financial condition of debtor-transferor both before and after transfer; (5) cumulative effect of transactions and course of conduct after onset of financial difficulties; and (6) general chronology and timing of transfer in question; presence of several of these "badges" leads to conclusion that debtor possessed the necessary fraudulent intent to support denial of discharge under "false oath" discharge exception. 11 U.S.C.A. § 727(a)(4)(A).

**[25] Bankruptcy 51 ☞3274**

51 Bankruptcy
   51X Discharge
     51X(B) Dischargeable Debtors
      51X(B)1 In General
       51k3273 Grounds for Denial of Discharge
        51k3274 k. Intent. Most Cited Cases

**Bankruptcy 51 ☞3284**

51 Bankruptcy
   51X Discharge
     51X(B) Dischargeable Debtors
      51X(B)1 In General
       51k3282 False Oath or Account
        51k3284 k. Errors on and
Omissions from Schedules. Most Cited Cases

Omissions from Chapter 7 debtor's bankruptcy schedules, including debtor's interest in leases and security deposits, were done with requisite fraudulent intent, and supported denial of debtor's discharge based upon his false oaths, given that omissions were inconsistent with debtor's disclosures in prior Chapter 13 case, that debtor knew of leases prepetition, and that debtor made no attempt to timely and truthfully correct these known inaccuracies and omissions. 11 U.S.C.A. § 727(a)(4)(A).

**\*881** Peter N. Hill, Wolff Hill McFarlin and Herron PA, Orlando, FL, for Debtor.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

David M. Landis, Lead Attorney, Mateer & Harbert, P.A., Orlando, FL, for Plaintiff.

### *MEMORANDUM OPINION*

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This case came before the Court on the Complaint FN1 filed by Plaintiff Leigh R. Meininger, the Chapter 7 Trustee and Plaintiff ("Plaintiff" or "Trustee"), against Mohammed Owais Khanani, the Defendant and Debtor ("Debtor" or "Khanani"). This is an action to determine whether the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727. A trial was held on April 20, 2005. Appearing at trial were the Plaintiff, counsel for the Plaintiff, the Debtor, and counsel for the Debtor. After reviewing the pleadings and evidence, and hearing live testimony and argument of the parties, the Court finds that the Plaintiff has established that the Debtor should be denied a discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(4)(A), and judgment will be entered for the Plaintiff.

FN1. Doc. No. 1.

The following Findings of Fact and Conclusions of Law are made:

### *FINDINGS OF FACT*
### *Background Facts and Events*

The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 2, 2004 ("Petition Date"). The Plaintiff is the Chapter 7 Trustee. The Debtor filed a previous individual bankruptcy case under Chapter 13 with this Court on April 1, 2003, captioned *In re Mohammed Owais Khanani,* Case No. 6:03–bk–03536–ABB ("Chapter 13 Case"). The case was converted to Chapter 11 and dismissed on October 20, 2003, with a 180–day filing prohibition imposed by the Court. The Debtor has also been involved in at least one bankruptcy case filed by a company owned, or partially owned, by the Debtor. FN2

FN2. Doc. No. 24 (Transcript of 2/17/2004

deposition), p. 14.

**\*882** The Trustee filed his Complaint in this case alleging that the Debtor's discharge should be denied: (i) pursuant to 11 U.S.C. § 727(a)(3), for failing to keep or preserve sufficient recorded information from which the Debtor's financial condition or business transactions might be ascertained; and (ii) pursuant to 11 U.S.C. § 727(a)(4)(A), for knowingly and fraudulently making false oaths in his Schedules and Statement of Financial Affairs.

The Debtor has two siblings, a sister named Hunaina Khanani, a/k/a Hunaina Sattar, and a brother named M. Hani Khanani. The Debtor's father is M. Saleem Khanani and his mother is Hurshi Khanani. The Debtor's father is the family patriarch. He is a businessman and has been actively involved in the Debtor's financial affairs. The Debtor is married to Faiza Khanani.

The Debtor attended college for two and a half years and withdrew to start an apparel business based in Orlando, Florida. He achieved great success with this business when the brand label came to be recognized in the resort market. The Debtor later sold the business to his two business partners. The Debtor became interested in the stock market and started his own trading business in late 1997 or early 1998, which, according to the Debtor, in less than three years was worth over $1,000,000. The trading business had hundreds of customers with nine offices nationwide, with a local office in the SunTrust Bank building in Orlando, Florida, which closed in the first quarter of 2002 after suffering declining revenues and rising overhead expenses.

Khanani has owned and been involved in a multitude of businesses since his first business venture in his teens. He described at length the number of businesses he has owned over the years and his high level of business acumen and experience. In Question No. 18 of his Statement of Financial Affairs the Debtor lists 20 different

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

business entities he was involved in within six years of the Petition Date.[FN3]

> FN3. Doc. No. 17, in the main case.

### Examinations and Requests for Information from the Debtor

The Debtor was deposed twice pre-petition in connection with a judgment obtained against him by Coneca Inc. The first deposition took place on February 17, 2004 at which the Debtor was asked about a parcel of real property located in Byram Township, Sussex County, New Jersey (the "Property"). The Debtor testified that he did not own or have an interest in any real property. However, later in the deposition the Debtor admitted he might have an interest in the Property.[FN4]

> FN4. The deposition was continued to May 5, 2004 (transcript is at Doc. No. 25) and the Debtor testified that he no longer had an ownership interest in the Property, but he gave no details as to what had happened to his interest in the Property.

The Debtor filed his Schedules and Statement of Financial Affairs in this case on July 21, 2004. The Debtor declares he had not transferred any interest in any property within one year prior to the Petition Date[FN5] and "none" for interests in real property in Schedule A.[FN6] The Plaintiff asked the Debtor whether he had sold, given away or transferred anything during the year before filing the bankruptcy case at the August 5, 2004 § 341 meeting of creditors and the Debtor responded in the negative.

> FN5. Plaintiff's Exh. No. 3 at Question No. 10.

> FN6. Plaintiff's Exh. No. 2.

The Trustee served a Subpoena Duces Tecum[FN7] on Khanani requiring him to appear**883** at a Rule 2004 examination on August 18, 2004 and to produce documents including personal and business bank account statements, credit card statements, deeds to property, real property transfer documents, executory contracts, and tax returns. The items requested and the time period covered by the Subpoena were reasonable and the items were important to the Trustee's investigation of this case. The Debtor produced only one bank statement for an account at Amsouth Bank and credit card and bank account numbers, but no other bank records or credit card statements at the Rule 2004 examination on September 28, 2004. Khanani indicated he made no effort to obtain credit card or bank account records because he could not pay the costs of obtaining the records.

> FN7. Doc. No. 22 in the main case.

The Debtor produced a Deed dated May 21, 1988 and recorded July 27, 1988 in the public records of Sussex County, New Jersey and an Affidavit of Consideration or Exemption or Partial Exemption, pursuant to which he and his two siblings obtained title to the Property.[FN8] The Property was a gift to him and his siblings from his parents and the Property was no longer under his name.[FN9] The Debtor claimed he did not know whether he had signed any documents transferring the Property out of his name. He had made no investigation of the transfer.[FN10]

> FN8. Plaintiff's Exh. No. 10.

> FN9. Doc. No. 26, p. 9.

> FN10. *Id.;* p. 8, ln. 25, pp. 9–10 and p. 11, ln. 1–6.

The Plaintiff tried to obtain basic income and expense information from the Debtor at the examination. The Debtor's Schedule I states $0.00 in monthly income, but Schedule J reflects household expenditures of $4,770.00. The Debtor testified that neither he nor his wife are working and that his father gives money to his wife each month. He did not explain where the money comes from, the form of payment, what account the money

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

goes into, or how the money is used. Khanani refused to answer questions regarding his father's and wife's financial affairs. He would not provide specific addresses for his brother and sister and would not discuss their employment status.

Khanani admitted that his Schedules were inaccurate because certain commercial and residential leases were not disclosed as executory contracts. He failed to disclose in his Schedules his interest in a Commercial Lease Agreement dated July 15, 1994 for a property known as the Visitors Plaza Shopping Center, which names him as a tenant.[FN11] Premier Restaurant, Inc. ("Premier") operates a Western Sizzler Restaurant in the Visitors Plaza space and for a period of time the Debtor had been receiving a draw from Premier. [FN12] The Debtor failed to disclose any information in his original Chapter 7 Schedules regarding this commercial lease, a connection to Premier,[FN13] or the residential lease for his address of record.[FN14]

FN11. Plaintiff's Exh. No. 9.

FN12. Doc. No. 24, pp. 6–7.

FN13. It is noteworthy that the Debtor disclosed in Schedules B and G in the Chapter 13 Case his interest in the Visitors' Plaza commercial lease, with a description of the lease having a ten-year term beginning on July 15, 1994 and the existence of a security deposit of $48,000. The Debtor also disclosed in Schedule B in the Chapter 13 Case that he owned 10% of the stock in Premier valued at $150,000.00.

FN14. Plaintiff's Exhibit No. 8.

The Debtor amended his Schedules months after the Rule 2004 examination concluded disclosing his interest in the Visitors' Plaza commercial lease, the residential lease for his home, and the $2,100.00 residential security deposit held by his **\*884** landlords. The Western Sizzler

Steakhouse continued to operate until several days prior to the trial, but none of the amendments address the Debtor's involvement with or connection to the business operating at the Visitors' Plaza property.

Three months after the Rule 2004 examination counsel for the Debtor forwarded a copy of a Bargain and Sale Deed dated May 4, 2004 ("Sale Deed") to counsel for the Trustee.[FN15] The Debtor signed the Sale Deed on May 9, 2004 and it was recorded in the land records for Sussex County on June 8, 2004. The Sale Deed transferred the Property from the Debtor and his siblings to an entity named "198001191977 Byram Township Land Trust" ("Transferee") for $1.00. The Transferee's address in the Sale Deed is 7512 Dr. Phillips Blvd., Suite 50 PMB 288, Orlando, FL 32819. This address is a rented mailbox in a UPS Store. The customer who had rights and access to the mailbox on the date of execution of the Sale Deed is an entity known as 7051 Trading, LLC ("LLC") and Hunaina Sattar, the Debtor's sister.

FN15. Plaintiff's Exh No. 12.

On February 18, 2005, the Debtor filed an amendment to his Statement of Financial Affairs:

"Question 10 should reflect that on May 4, 2004 the Debtor transferred his interest in property known as Byram Township, Block No. 76, Lot No. 71–96, Sussex County, New Jersey to 198001191977 Byram Township Land Trust, 7512 Dr. Phillips Blvd., Suite 50 PMB 288, Orlando, FL 32819 for $1.00. The transferee is of no relation to the Debtor."[FN16]

FN16. Plaintiff's Exh. No. 7.

When questioned at trial as to the truthfulness of the representation in this amendment that the Transferee of the Property "is of no relation to the Debtor," the Debtor's sole response was "I don't know who the trust beneficiaries are." [FN17] Khanani knew he was not a settlor or beneficiary of

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

the trust, but he had never seen a copy of the trust documents. [FN18] He conducted no investigation into the transfer of the Property whatsoever and had never seen the Property, but claimed it had little or no value. He produced no documentation to substantiate his testimony. [FN19]

FN17. Trial transcript, p. 16, ln. 15–20.

FN18. *Id.*

FN19. Trial transcript, p. 43, ln. 18–25, p. 44, ln. 1–23, p. 50, ln. 9–25, and p. 51, ln. 1.

### *CONCLUSIONS*

[1] The Bankruptcy Code imposes certain obligations upon those who seek bankruptcy protection. A fundamental obligation is that a debtor be forthright with the Court, the creditors, and the trustee. Fulfilling this obligation should not be difficult for a debtor. The Debtor has failed to fulfill this most basic and important obligation. He has not been forthright with the Court, his creditors, or the Trustee.

Khanani repeatedly failed and, in many instances refused, to provide relevant, important information to the Trustee. He failed to provide, among other things, bank statements, credit card statements, tax returns, and W–2s. He never responded in any meaningful or adequate way to the August 2004 Subpoena, nor made any effort to obtain and produce his records.

Khanani refused to answer basic, relevant financial questions relating to his siblings, his wife, his father, and how his household expenses are handled. He would not cooperate with the Trustee and provide information regarding his sister because he did not want his sister to be subjected to an investigation.

**\*885** The Debtor gave various excuses as to why he could not comply with the Trustee's requests for information. One excuse was that there was a cost involved in obtaining his bank and credit account statements and he could not afford to pay the cost. Another excuse involved an unidentified former assistant and a commercial landlord. Khanani testified that in the past he had a full-time personal assistant who maintained his books and records and paid his bills. He explained that his records were kept by his personal assistant in the corporate offices for his business in the SunTrust Bank building from which his business was ultimately evicted. He further testified that all of his records were left in a storage room in the SunTrust Bank building and he was unable to get into the building and retrieve them.

These excuses are neither effective to negate the Debtor's obligation to produce information nor credible. If there was a cost involved in obtaining account statements, the Debtor needed to bear any reasonable cost and obtain the statements. The Debtor's testimony regarding his records being lost to a landlord is not credible. The Debtor sets forth in his Statement of Financial Affairs at Question No. 19 that he maintains his books, records, and financial statements and they are kept at his address of record of 7906 Bayflower Way, Orlando, Florida 32836. [FN20] The Debtor makes no mention in his Statement of Financial Affairs that his records are anywhere but in his own possession. Likewise, there is no mention in the Statement of Financial Affairs that any records were lost, seized, or transferred. The Debtor is a sophisticated, knowledgeable businessman who knows the importance of maintaining adequate and accurate records. Khanani was obstreperous throughout this case and failed to adequately produce his records to the Trustee.

FN20. Doc. No. 17 in the main case.

The Debtor failed to make truthful disclosures and withheld material information from the Trustee. He was aware of his interest in the Property as early as February 2004 and had an obligation to investigate the Property and his interest in it. Between the February 2004 deposition date and the Petition Date, Khanani had ample time to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

investigate the Property in order to make full and accurate required disclosures. However, he failed to disclose any information relating to the Property in his Schedules or Statement of Financial Affairs. The Debtor executed the Sale Deed on May 9, 2004, transferring his and his siblings' interest in the Property to a trust. Even if the Debtor's father had presented the Sale Deed to the Debtor and pressed him to sign it, he would have recalled signing the document and understood its import. On the Petition Date the Debtor knew he had transferred his interest in the Property and he knowingly failed to disclose such transfer in his Statement of Financial Affairs.

As the case progressed the Debtor continued to conceal material information and made false oaths concerning the Property. The Debtor testified at his § 341 meeting that he had not sold, given away or transferred anything during the year before filing the bankruptcy case. This testimony was false. The Debtor failed to disclose the details of the transfer of the Property at the Trustee's 2004 examination in September 2004. Khanani testified that he did not know whether he had signed any documents transferring the Property out of his name and had made no investigation of the transfer. This testimony was false.

It was not until February 18, 2005, more than a year after the Property was brought to the Debtor's attention, his Statement of Financial Affairs was amended disclosing the transfer of the Property. **\*886** The amendment provides additional basis of the Debtor's attitude towards his duties and responsibilities. The untimely amendment contains a false material statement of fact. The Debtor asserts in the amendment that the Transferee "is of no relation to the Debtor." However, the Transferee's address of record is a commercial mailbox rented by the Debtor's sister and a LLC owned and controlled by insiders of the Debtor. The Debtor was nonplussed to hear these facts at trial. He admitted that he is familiar with the LLC and that his mother and wife are members of the

LLC. The connections between the Debtor and the Transferee were required to be disclosed.

The Debtor has been uncooperative with the Trustee throughout this case. He failed to keep and preserve information relating to his personal and business affairs, concealed such information from the Trustee, and impeded the Trustee from ascertaining his financial condition and material business transactions. Khanani has not provided any plausible reason why his failures to preserve and produce the information are justified under all of the circumstances of this case.

The Debtor has made false oaths and accounts regarding material and important information. He made false oaths and accounts in his Schedules, his Statement of Financial Affairs, his amended Statement of Financial Affairs, at his § 341 meeting of creditors, and the 2004 examination. The Debtor made the false oaths and accounts knowingly and fraudulently.

### *CONCLUSIONS OF LAW*
### *11 U.S.C. § 727(a)(3)*

[2][3] The Trustee alleges that the Debtor should be denied a discharge pursuant to § 727(a)(3) of the Bankruptcy Code, which provides that the Court shall grant a debtor a discharge unless:

> the debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case....

11 U.S.C. § 727(a)(3). The purpose of § 727(a)(3) is to make certain that the creditors and the trustee are given sufficient information to understand the debtor's financial condition. 6 COLLIER ON BANKRUPTCY ¶ 727.03 [3][a], at 727–31 (15th ed. rev.2004). To qualify as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

sufficient, the debtor's presented records must enable his creditors to ascertain his present financial condition and to follow his business transactions for a reasonable period of time in the past. *In re Juzwiak,* 89 F.3d 424, 427 (7th Cir.1996).

[4][5][6][7][8]  The trustee objecting to discharge carries the initial burden to show reasonable grounds to believe that the books or records are inadequate. *In re Milam,* 172 B.R. 371, 375 (Bankr.M.D.Fla.1994); Fed. R. Bank. Pro. 4005. The trustee must show by a preponderance of the evidence that a debtor is not entitled to a discharge. *In re Scott,* 172 F.3d 959, 966–7 (7th Cir.1999). Section 727(a)(3) does not require a full accounting of every business transaction, but "there should be some written records, orderly made and preserved, from which the present and past financial condition of the debtor may be ascertained with substantial completeness and accuracy." *In re Sowell,* 92 B.R. 944, 947 (Bankr.M.D.Fla.1988). Each case must be determined on its own facts. *Milam,* 172 B.R. at 375. The standard applied to a debtor who is involved in business may be more stringent than the standard imposed on a debtor who is an unsophisticated wage earner. *Id.;* **\*887** *Meridian Bank v. Alten,* 958 F.2d 1226, 1231 (3d Cir.1992).

[9][10]  Once the objecting party makes an initial showing that a debtor failed to maintain or preserve adequate records from which his financial condition or business transactions could be ascertained, the burden then shifts to the debtor "to explain satisfactorily the loss." *In re Chalik,* 748 F.2d 616, 619 (11th Cir.1984); 6 COLLIER ON BANKRUPTCY ¶ 727.03[4], at 727–37. The debtor carries the burden of persuasion to explain the failure to keep records because the information necessary to establish such an excuse is generally in the possession of the debtor. *Meridian Bank v. Alten,* 958 F.2d at 1233. A debtor must explain his or her losses or deficiencies of documentation in such a manner to convince the Court of good faith

and businesslike conduct. *Id.* "The plain language of section 727(a)(3) places the burden on the debtor to justify the lack of adequate record keeping." *Id.* at 1234.

[11]  Khanani was to produce his books and records to the Trustee pursuant to the Subpoena. The Subpoena delineated 20 different items relating to the Debtor's personal and business records, including bank and credit card statements, tax returns, W–2s, deeds, and property transfer documents. Khanani produced only one bank statement, some account numbers, but no other records, and he made no effort to keep, preserve, or locate his business and personal records. He repeatedly failed to produce information relating to the Property, even though the Trustee made many requests for such information. He refused to answer basic questions regarding his financial transactions and matters relating to insiders. The Debtor concealed from the Trustee important information relating to his financial standing and business dealings.

The Trustee has established that Khanani failed to keep and preserve his personal and business records, and concealed relevant information. The Debtor's failures to produce records and financial information have prevented the Trustee and the creditors from ascertaining the Debtor's financial condition and understanding his business transactions. The Trustee has carried his burden pursuant to § 727(a)(3).

[12][13]  The Debtor did not produce his bank and credit account statements because the cost to obtain the records was too great. This explanation is unsatisfactory. The Debtor had a duty to obtain the records and he failed to carry out this duty. Khanani could not produce his personal and business records because they had been kept by a former secretary in the SunTrust building and were lost to the landlord during an eviction. This explanation is unsatisfactory. First, this testimony is contradictory to the Debtor's Statement of Financial Affairs stating that the Debtor is in

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

possession of the records. Second, the Debtor made no attempt to preserve or retrieve these records. He presented no evidence he made any effort to communicate with the former landlord, to communicate with his former assistant, or to find the records. It was the duty of the Debtor to provide the Trustee with adequate business and personal financial information and he failed to fulfill that duty. The Debtor's explanations as to why he did not produce the records to the Trustee are unsatisfactory.

[14] Because the Debtor is an experienced businessman he is held to a higher standard of care in his record keeping. With his extensive dealings in the arena of finance and investment businesses, the Debtor knew the importance of keeping accurate, complete records. He is no stranger to bankruptcy procedure and the disclosure requirements through his previous Chapter 13 case and involvement in at least one corporate bankruptcy case. **\*888** Based on the circumstances of this case, the Debtor's failure to retain, protect, and produce his personal and business financial records was not justified. Therefore, the Debtor's discharge is due to be denied pursuant to 11 U.S.C. § 727(a)(3).

### 11 U.S.C. § 727(a)(4)(A)

[15][16][17] The Trustee also seeks denial of the Debtor's discharge pursuant to § 727(a)(4)(A) of the Bankruptcy Code, which provides that the Court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The party objecting to the debtor's discharge in a § 727(a)(4)(A) action carries the burden of proof and must show by a preponderance of the evidence that a debtor is not entitled to a discharge. Fed. R. Bankr.Pro. 4005; In re Scott, 172 F.3d at 966–7. In a § 727(a)(4)(A) discharge objection proceeding, the objecting party must show that the debtor made the false oath knowingly and fraudulently. In re Chalik, 748 F.2d at 619. The requisite intent may

be established by the objecting party through inference from the facts. 6 COLLIER ON BANKRUPTCY ¶ 727.04[1][b], at 727–40.

[18][19][20][21] The Eleventh Circuit has held a discharge should be denied where the omission from the Schedules or Statement of Financial Affairs is both fraudulent and material. *Swicegood v. Ginn,* 924 F.2d 230, 232 (11th Cir.1991). The subject matter of a false oath is considered "material" and thus sufficient to bar discharge if it "bears a relationship to the bankrupt's business transactions or estate or concerns the discovery of assets, business dealings or the existence and disposition of his property." *In re Chalik,* 748 F.2d at 618. It is irrelevant that a debtor does not intend to injure his creditors when he makes a false statement. *Id.* "A debtor has a paramount duty to consider all questions posed on a statement or schedule carefully and see that the questions are answered completely in all respects." *In re Sofro,* 110 B.R. 989, 991 (Bankr.S.D.Fla.1990). It is not the job of the debtor to determine which of the questions are relevant or material. *Haught v. U.S.,* 242 B.R. 522, 526–7 (M.D.Fla.1999).

### *The Sussex County Property*

[22] The Debtor admits the statement in his Statement of Financial Affairs that he had not transferred any property was false because he executed the Sale Deed prior to the Petition Date. The Debtor asserts that the error was inadvertent and not knowing or fraudulent. Because "it is always difficult to prove that a false oath was intentionally made, an inference of such intent can be drawn from the circumstance surrounding the debtor." *Haught v. U.S.,* 242 B.R. at 525 (citing *In re Vincent,* 159 B.R. 595, 597 (Bankr.M.D.Fla.1993)).

[23] Khanani had the requisite fraudulent intent pursuant to 11 U.S.C. § 727(a)(4)(A) when he filed his original Statement of Financial Affairs with the false statement in Question 10 based upon the circumstances surrounding the Debtor. Fraudulent intent can be drawn from the following

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

circumstances: (i) The Debtor was questioned at length on the Property at two pre-petition depositions, the first in February 2004 and the second in May 2004, conducted by a judgment creditor. (ii) The Debtor had ample time after the first deposition to investigate the Property and understand what interest he had in the Property. (iii) Days after the second deposition concluded, the Debtor executed the Sale Deed on May 9, 2004.(iv) The Sale Deed was recorded less than twenty-five days before the Petition Date. (v) The Debtor is a sophisticated businessman, **889** with previous experience in bankruptcy, who understands the import and effect of executing the Sale Deed. (vi) Khanani gave false testimony at the § 341 meeting concerning the Property and its transfer and repeatedly failed to produce documents regarding the Property. (vii) He produced only a copy of the Deed, but failed to produce a copy of the Sale Deed, at the Rule 2004 examination in September 2004, and did not produce the Sale Deed until February 2005. Taking all of these facts and circumstances together, the Debtor knowingly and fraudulently made a false statement in his Statement of Financial Affairs when he failed to disclose the transfer of the Property.

The Debtor made another false statement when he filed his Amendment to the Statement of Financial Affairs on February 18, 2005 stating that the Transferee of the Property "is of no relation to the debtor." The false statement was intentional as established by the surrounding circumstances: (i) There are close connections between the Transferee and the Debtor. The address for the Transferee on the Sale Deed is a private mailbox at a UPS Store controlled by the LLC and the Debtor's sister. (ii) The LLC is owned and managed by the Debtor's mother and wife. (iii) The Debtor testified that he was not surprised the address for the Transferee is a mailbox rented by his sister and the LLC in which his wife and mother are involved.

[24] "Badges of fraud" are factors strongly indicating the existence of fraudulent intent. *In re*

*Ingersoll*, 124 B.R. 116, 121–2 (M.D.Fla.1991). Common badges of fraud include: (1) the lack or inadequacy of consideration for the property transferred; (2) the existence of a family, friendship or other close relationship between the transferor and the transferee; (3) the transferor's retention of the possession, control, benefits or use of the property in question; (4) the financial condition of the transferor both before and after the transfer took place, i.e. whether the transfer resulted in insolvency; (5) the cumulative effect of these transactions and course of conduct after the onset of financial difficulties or dependency or threat of suit by creditors; and (6) the general chronology and timing of the transfer in question. *Id.*

The presence of several of these "badges" leads to the conclusion that a debtor possessed the necessary fraudulent intent to support a denial of discharge pursuant to § 727(a)(4)(A). *Id.* at 124. The presence of only one of these factors has been held to justify a finding of actual fraudulent intent. *Id.*

The facts establishing the Debtor's fraudulent intent include: (i) The Sale Deed states the consideration for the transfer to be $1.00. Such consideration is patently inadequate. (ii) The Transferee's address is a private mailbox rented by the Debtor's sister and the LLC, which is controlled and owned by the Debtor's wife and mother. (iii) The transfer of the Property was effectuated five days after the deposition at which the Debtor testified he no longer owned an interest in the Property. (iv) The transfer was recorded less than twenty-five days before the Petition Date. At least three of the badges of fraud are present.

The Property transfer information omitted from the original Statement of Financial Affairs relates to the Debtor's business transactions, his financial dealings, the discovery of assets, and the disposition of his property. The omission is fraudulent and material. The statement made by the Debtor at the § 341 meeting that he had not sold, given away or transferred anything during the year

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

before filing the bankruptcy case was false. The statement made under oath, at the 2004 examination, that he was not certain that what happened to his interest in the Property was false. **\*890** The Debtor's statement in the Amendment to the Statement of Financial Affairs that he has no connection to the Transferee is false. All of the circumstances surrounding the Debtor establish he made false statements and oaths regarding material matters knowingly and intentionally. The Debtor's discharge is due to be denied pursuant to 11 U.S.C. § 727(a)(4)(A).

### Omissions in Schedules

[25] The Debtor was less than forthcoming in his Schedules. The Debtor filed his original Schedule G stating that he had "no executory contracts or unexpired leases" and in Schedule B he had no security deposits with public utilities, telephone companies, landlords, and others. The Debtor admitted in sworn testimony that Schedule G was inaccurate because he had an interest in two executory contracts—the Visitors' Plaza lease and his residential lease. FN21 He also admitted that Schedule B was inaccurate because a security deposit was being held by his residential landlord.

FN21. 2004 examination transcript at pp. 13–14.

The Debtor was well aware of the existence of these leases before he filed his Chapter 7 petition. The existence of the leases was admitted by the Debtor at the first deposition on February 17, 2004. Khanani disclosed the existence of the Visitors' Plaza lease in his previous bankruptcy case in both Schedules G and B. While the Debtor was questioned about his interest in these leases on February 17, 2004, and then again at the 2004 examination on September 28, 2004, he did not file amendments to his Schedules until several months later on December 9, 2004. FN22 The failures to disclose his interest in the Visitors' Plaza lease and the residential lease and the existence of the residential security deposit, were material omissions by the Debtor.

FN22. There is no evidence before the Court as to whether the Debtor, on the Petition Date, continued to hold an ownership interest in Premier. If he did continue to hold an ownership interest in Premier, then he failed to make such disclosure in Schedule B. Likewise, there is no evidence before the Court as to whether the Debtor continues to hold an interest in any security deposit held by the Visitors' Plaza landlord. If on the Petition Date the Debtor held such an interest, Schedule B is inaccurate. If the Debtor transferred either his interest in Premier or the security deposit pre-petition, then his Statement of Financial Affairs should reflect such transfer. That would be the only way to address the inconsistencies between the Debtor's Chapter 13 disclosures and his Chapter 7 disclosures.

A fraudulent intent can be inferred from all of these facts and circumstances. The Debtor's Chapter 7 disclosures are inconsistent with his Chapter 13 disclosures. The existence of the leases was known to the Debtor pre-petition, yet he filed inaccurate and incomplete Schedules. The Debtor made no attempt to timely and truthfully correct these known inaccuracies and omissions. The Debtor's December 9, 2004 amendments to his Schedules were untimely and do not cure his original omissions. The information omitted relates to the Debtor's business transactions, his financial dealings, the discovery of assets, and the disposition of his property. The omissions from the Schedules are fraudulent and material. The Debtor knowingly and fraudulently made false oaths pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

The Debtor has crossed the line between being merely dilatory and unresponsive, but deserving of a discharge, and committing acts and omissions that call for the denial of his discharge. For the foregoing reasons, the Debtor is not entitled to a discharge and a discharge is due to be denied

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 878, 20 Fla. L. Weekly Fed. B 437
**(Cite as: 374 B.R. 878)**

pursuant to 11 U.S.C. §§ 727(a)(3) and 727(a)(4)(A).

**\*891** The Court will enter a separate judgment consistent with these findings of fact and conclusions of law.

### *JUDGMENT*

The Complaint of the Plaintiff, Leigh R. Meininger, Chapter 7 Trustee ("Plaintiff"), against Mohammed Owais Khanani, the Defendant and Debtor herein ("Debtor"), to determine whether the Debtor is entitled to receive a discharge of debt, having been tried before the Court and after reviewing the pleadings, evidence, receiving testimony, exhibits, and in conformity with and pursuant to the **Memorandum Opinion** entered contemporaneously herewith, it is

**ORDERED, ADJUDGED** and **DECREED** that the relief sought in the Plaintiff's Complaint is **GRANTED** and **JUDGMENT** is hereby entered for the Plaintiff and against Mohammed Owais Khanani; and it is further

**ORDERED, ADJUDGED** and **DECREED** that Mohammed Owais Khanani's **DISCHARGE** is hereby **DENIED** pursuant to §§ 727(a)(3) and 727(a)(4)(A) of the Bankruptcy Code.

Bkrtcy.M.D.Fla.,2005.
In re Khanani
374 B.R. 878, 20 Fla. L. Weekly Fed. B 437

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Select Year: 2013 ☑ | Go |

# The 2013 Florida Statutes

| <u>Title XV</u> | <u>Chapter 222</u> | <u>View Entire</u> |
|---|---|---|
| HOMESTEAD AND EXEMPTIONS | METHOD OF SETTING APART HOMESTEAD AND EXEMPTIONS | <u>Chapter</u> |

**222.30    Fraudulent asset conversions.—**

(1)   As used in this section, "conversion" means every mode, direct or indirect, absolute or conditional, of changing or disposing of an asset, such that the products or proceeds of the asset become immune or exempt by law from claims of creditors of the debtor and the products or proceeds of the asset remain property of the debtor. The definitions of chapter 726 apply to this section unless the application of a definition would be unreasonable.

(2)   Any conversion by a debtor of an asset that results in the proceeds of the asset becoming exempt by law from the claims of a creditor of the debtor is a fraudulent asset conversion as to the creditor, whether the creditor's claim to the asset arose before or after the conversion of the asset, if the debtor made the conversion with the intent to hinder, delay, or defraud the creditor.

(3)   In an action for relief against a fraudulent asset conversion, a creditor may obtain:

(a)   Avoidance of the fraudulent asset conversion to the extent necessary to satisfy the creditor's claim.

(b)   An attachment or other provisional remedy against the asset converted in accordance with applicable law.

(c)   Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

1.   An injunction against further conversion by the debtor of the asset or of other property.

2.   Any other relief the circumstances may require.

(4)   If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset converted or its proceeds.

(5)   A cause of action with respect to a fraudulent asset conversion is extinguished unless an action is brought within 4 years after the fraudulent asset conversion was made.

(6)   If an asset is converted and the converted asset is subsequently transferred to a third party, the provisions of chapter 726 apply to the transfer to the third party.

History.—s. 5, ch. 93-256.

Copyright © 1995-2014 The Florida Legislature • <u>Privacy Statement</u> • <u>Contact Us</u>

APPENDIX
2

Page 1

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

C

United States Court of Appeals,
Ninth Circuit.
In re Alexis Hill SCHWARZKOPF, aka Alexis
Michaels, aka Alex Michaels; Joanne Louise
Michaels, aka Joanne Louise Schwarzkopf,
Debtors,
Robert L. Goodrich, Chapter 7 Trustee, Appellant,
v.
Juan Briones, Trustee for Kokee Family Trust
1992, aka The Apartment Trust; Alexis Hill
Schwarzkopf, aka Alexis Michaels, aka Alex
Michaels; Joanne Louise Michaels, aka Joanne
Louise Schwarzkopf, Appellees.
In the Matter of Joanne Louise Michaels, aka
Joanne Louise Schwarzkopf and Alexis Hill
Schwarzkopf, aka Alexis Michaels, aka Alex
Schwarzkopf, Debtors,
Juan Briones, Trustee for Kokee Family Trust
1992, aka The Apartment Trust; Alexis Hill
Schwarzkopf, aka Alexis Michaels, aka Alex
Michaels; Joanne Louise Michaels, aka Joanne
Louise Schwarzkopf, Appellants,
v.
Robert L. Goodrich, Chapter 7 Trustee, Appellee.

Nos. 08–56974, 08–57026.
Argued and Submitted June 9, 2010.
Filed Nov. 23, 2010.

**Background:** Chapter 7 trustee of debtors'
bankruptcy estates sought to recover for the estates'
benefit approximately $4 million in assets that he
alleged were fraudulently transferred to two
irrevocable trusts. The Bankruptcy Court ruled that
one of the trusts was debtor's alter ego but that the
other trust was valid. On appeal, the United States
District Court for the Central District of California,
S. James Otero, J., reversed in part, and appeal was
taken.

**Holdings:** The Court of Appeals, Goodwin, Senior
Circuit Judge, held that:

(1) trust created simultaneously with debtor's
transfer of stock to trust for the fraudulent purpose
of avoiding his creditors was invalid under
California law;

(2) California's seven-year limitations period for
actions to set aside a fraudulent transfer did not
begin to run until resulting trustee repudiated the
trust by answering complaint and denying that the
trust's assets were property of the bankruptcy
estate;

(3) debtor was equitable owner of second trust for
purposes of alter ego liability under California law;
and

(4) second trust was alter ego of debtor.

Affirmed in part and reversed in part.

West Headnotes

**[1] Bankruptcy 51 ⟨⟩3782**

51 Bankruptcy
　51XIX Review
　　51XIX(B) Review of Bankruptcy Court
　　　51k3782 k. Conclusions of law; de novo
review. Most Cited Cases

**Bankruptcy 51 ⟨⟩3786**

51 Bankruptcy
　51XIX Review
　　51XIX(B) Review of Bankruptcy Court
　　　51k3785 Findings of Fact
　　　　51k3786 k. Clear error. Most Cited
Cases

　　Court of Appeals applies the same standard of
review to the bankruptcy court findings as does the
district court: findings of fact are reviewed under
the clearly erroneous standard, and conclusions of
law, de novo.

**[2] Trusts 390 ⟨⟩51**

390 Trusts
　390I Creation, Existence, and Validity

APPENDIX
3

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

390I(A) Express Trusts

390k45 Validity

390k51 k. Illegality of provisions.
Most Cited Cases

Under California law, a trust created for the purpose of defrauding creditors or other persons is illegal and may be disregarded. West's Ann.Cal.Prob.Code § 15203.

**[3] Trusts 390 ☞48**

390 Trusts

390I Creation, Existence, and Validity

390I(A) Express Trusts

390k45 Validity

390k48 k. Fraud. Most Cited Cases

Under California law, trust created simultaneously with debtor's transfer of stock to trust for the fraudulent purpose of avoiding his creditors was invalid.

**[4] Trusts 390 ☞68**

390 Trusts

390I Creation, Existence, and Validity

390I(B) Resulting Trusts

390k64 Failure or Defect in Creation, Operation or Execution of Express Trust

390k68 k. Failure, lapse, or other extinguishment of trust. Most Cited Cases

Under California law, if an express trust fails—if, for instance, it was formed for a fraudulent purpose—the trustee holds legal title to the property on a resulting trust for the trustor and his or her heirs.

**[5] Limitation of Actions 241 ☞103(2)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k101 Existence of Trust

241k103 Repudiation or Violation of Trust

241k103(2) k. Necessity for

disclaimer or repudiation. Most Cited Cases

**Trusts 390 ☞62**

390 Trusts

390I Creation, Existence, and Validity

390I(B) Resulting Trusts

390k62 k. Nature of resulting trust. Most Cited Cases

Under California law, the trustee of a resulting trust is considered a voluntary trustee and the statute of limitations does not begin to run in favor of a voluntary trustee until he repudiates the trust.

**[6] Trusts 390 ☞66**

390 Trusts

390I Creation, Existence, and Validity

390I(B) Resulting Trusts

390k64 Failure or Defect in Creation, Operation or Execution of Express Trust

390k66 k. Ineffective declaration of trust, conveyance, or devise. Most Cited Cases

Determination that trust was invalid under California law because debtor's stock was transferred to trust to avoid creditors made its trustee a voluntary trustee of resulting trust for debtor and his heirs.

**[7] Limitation of Actions 241 ☞103(2)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k101 Existence of Trust

241k103 Repudiation or Violation of Trust

241k103(2) k. Necessity for disclaimer or repudiation. Most Cited Cases

**Limitation of Actions 241 ☞103(3)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

241k101 Existence of Trust

241k103 Repudiation or Violation of Trust

241k103(3) k. What constitutes repudiation or violation of trust. Most Cited Cases

California's seven-year limitations period for actions to set aside a fraudulent transfer, as applied to Chapter 7 trustee's claim to recover assets held in resulting trust to which debtor had transferred assets, did not begin to run until resulting trustee repudiated the trust by answering complaint and denying that the trust's assets were property of the bankruptcy estate. 11 U.S.C.A. 701 et seq.; West's Ann.Cal.Civ.Code § 3439.09(c).

**[10] Federal Courts 170B ☞383**

170B Federal Courts

170BVI State Laws as Rules of Decision

170BVI(B) Decisions of State Courts as Authority

170Bk382 Court Rendering Decision

170Bk383 k. Inferior state courts. Most Cited Cases

Federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently.

**[11] Trusts 390 ☞140(1)**

390 Trusts

390II Construction and Operation

390II(B) Estate or Interest of Trustee and of Cestui Que Trust

390k139 Extent of Estate or Interest of Cestui Que Trust

390k140 Express Trusts in General

390k140(1) k. In general. Most Cited Cases

Under California law, trust beneficiaries hold an equitable interest in trust property and are regarded as the real owners of that property.

**[12] Trusts 390 ☞140(1)**

390 Trusts

390II Construction and Operation

390II(B) Estate or Interest of Trustee and of Cestui Que Trust

390k139 Extent of Estate or Interest of Cestui Que Trust

390k140 Express Trusts in General

390k140(1) k. In general. Most Cited Cases

Under California law, equitable ownership in a trust is sufficient to meet the ownership requirement for purposes of alter ego liability.

**[14] Trusts 390 ☞151**

390 Trusts

390II Construction and Operation

390II(B) Estate or Interest of Trustee and of Cestui Que Trust

390k150 Rights and Remedies of Creditors of Cestui Que Trust

390k151 k. In general. Most Cited Cases

Under California law, trust was alter ego of Chapter 7 debtor who acted as its equitable owner, where debtor dominated and controlled all decisions of the trust, received payments from the trust without documentation and to avoid a creditor, and diverted assets to the detriment of his creditors, using his assets to acquire trust assets at a time when he was insolvent. 11 U.S.C.A. 701 et seq.

**\*1034** Leonard M. Shulman, Gary A. Pemberton and Franklin J. Contreras, Jr., Shulman Hodges & Bastian LLP, Foothill Ranch, CA, for the plaintiff-appellant-cross-appellee.

Martha A. Warriner, Reid & Hellyer, Riverside, CA, for the defendants-appellees-cross-appellants.

Appeal from the United States District Court for the Central District of California, S. James Otero, District Judge, Presiding. D.C. No. 5:07–cv–01547-SJO.

Before: ALFRED T. GOODWIN and JOHNNIE B.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

RAWLINSON, Circuit Judges, and ALGENON L. MARBLEY, District Judge.FN*

FN* The Honorable Algenon L. Marbley, District Judge for the Southern District of Ohio, sitting by designation.

## OPINION

GOODWIN, Senior Circuit Judge:

Robert L. Goodrich, the Chapter 7 trustee for the bankruptcy estates of Alex Michaels, aka Alexis Michaels, aka Alex Schwarzkopf ("Michaels"), and Joanne Louise Michaels, aka Joanne Louise Schwarzkopf (collectively, "the Debtors"), seeks to recover for the estates' benefit approximately $4 million in assets. Goodrich alleges that the Debtors fraudulently transferred those assets to two irrevocable trusts known as the Apartment Trust and the Grove Trust and that the district court erred in holding that neither trust is Michaels's alter ego. On cross-appeal, the **\*1035** Debtors contend that the district court erred in holding that the Apartment Trust is invalid and may therefore be disregarded.

[1] "We apply the same standard of review to the bankruptcy court findings as does the district court: findings of fact are reviewed under the clearly erroneous standard, and conclusions of law, *de novo.*" *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.),* 912 F.2d 1162, 1166 (9th Cir.1990). On *de novo* review of the district court's decision, *id.,* we conclude that the Apartment Trust is invalid and that the Grove Trust is Michaels's alter ego. We therefore affirm the district court's decision in part and reverse it in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Debtors created both the Apartment Trust and the Grove Trust on June 15, 1992. They named their minor child, Sydnee Michaels ("Sydnee"), beneficiary and appointed Juan Briones ("Briones") trustee.

Simultaneously with the creation of the Apartment Trust, Michaels transferred all the stock of Kokee Woods Apartments, Inc. ("Kokee Woods"), of which he was the sole shareholder, to the Apartment Trust. The bankruptcy court found that a Texas state-court verdict rendered against Kokee Woods made the stock potentially worthless at the time of the transfer. It also found, however, that the Debtors were insolvent and that "Michaels devised [the transfer] to avoid his creditors' ability to recover the asset because [he] intended to pursue an appeal of the Texas Verdict and he did not want to go through all the effort of an appeal only to have his creditors pursue the Corporation's stock." Therefore, it concluded, the transfer "was made for the fraudulent purpose of avoiding the Debtors' creditors." After the transfer, Michaels successfully appealed the verdict, winning a judgment of $8,096,120.45 plus interest. The trust paid Michaels's consulting fees of $3,000 per week to collect the judgment.

The only asset placed into the Grove Trust at its inception was $25.00. In December 1997, however, Michaels's company Impetrol Corporation purchased four lots of land containing avocado groves ("the Grove Lots") for the Grove Trust. The bankruptcy court noted that the assets used to acquire the Grove Lots belonged to Michaels and that "Impetrol was nothing but a shell ... to put properties in the corporate name." It found that the Debtors were insolvent at the time of the purchase and that "[t]he Grove Trust's acquisition of the Grove Lots was a fraud on the creditors of the Debtors." It also found that Michaels dominated and controlled all decisions related to both the Grove Lots and the Grove Trust and that "Briones had no role nor took any action ... other than to write checks as demanded by Michaels." The Grove Trust paid Michaels at least $105,000 in unexplained fees from February to September 2002.

Although the trusts paid for Sydnee's education, clothing, medical care, car, and golf lessons and tournament expenses, the Debtors also

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

benefitted from both trusts. The bankruptcy court found that "Mr. Briones provided payments to Mr. Michaels from both the Grove Trust and the Apartment Trust without complete documentation" and that, "[t]hrough his influence over Mr. Briones, Mr. Michaels received advances and expedited payments from either the Apartment Trust and/or the Grove Trust to avoid a creditor about to levy on a judgment against him." Michaels asked for and received reimbursement from one of the trusts for another daughter's wedding and for a life insurance **\*1036** policy; Briones testified that he did not know who Michaels named as the policy's beneficiary. The Debtors lived rent-free with Sydnee in a manufactured home that the Grove Trust purchased after acquiring the Grove Lots and in a house in Temecula, California that the Apartment Trust purchased in 2003.

Briones maintained no books or records for either trust prior to 2000 and often intermingled their funds. The trusts shared a bank account from October 2002 through January 2003, Briones transferred money between the trusts when he determined that one needed more, and the Apartment Trust made purported "loans" to the Grove Trust that were not documented, had no terms for repayment, and were never repaid. The trusts also paid each other's expenses. For example, the parties stipulated that the Grove Trust paid "various amounts for the maintenance" of the Temecula, California property held by the Apartment Trust, and that the Apartment Trust paid water bills and trustee fees for the Grove Trust.

In October 2003, the Debtors filed bankruptcy petitions seeking to discharge approximately $5.4 million in debt. Goodrich, as trustee for the consolidated bankruptcy estates, filed an adversary complaint seeking to recover approximately $4 million in assets from the Apartment Trust and the Grove Trust. Following a bench trial, the bankruptcy court initially concluded that both trusts are valid and that neither is the alter ego of the Debtors. On Goodrich's motion for reconsideration,

however, the court partially reversed its earlier ruling, holding that the Grove Trust is Michaels's alter ego. As to the Apartment Trust, it reaffirmed its earlier rulings that the trust is valid because it was created for the benefit of a minor child and that it is not Michaels's alter ego.

The district court affirmed the judgment of the bankruptcy court in part and reversed it in part. First, the district court held that the Apartment Trust is invalid because one of the Debtors' purposes in creating it was to defraud creditors, but it remanded for the bankruptcy court to determine whether that issue is time-barred, noting that Goodrich had failed to argue before the bankruptcy court that the seven-year statute of limitations did not begin to run until Briones repudiated the trust. Second, relying on *S.E.C. v. Hickey,* 322 F.3d 1123 (9th Cir.2003), the court held that legal ownership is a prerequisite to alter ego liability in California and that, because Michaels was neither trustee nor beneficiary of the trusts, they were not his alter ego. Goodrich appealed to this court, and the Debtors cross-appealed.

## II. DISCUSSION
### 1. *The Apartment Trust*

Goodrich argues that the district court erred in holding that the Apartment Trust is not Michaels's alter ego, while the Debtors, on cross-appeal, contend that it erred in holding that the Apartment Trust is invalid. We agree with the district court's conclusion that the Apartment Trust is invalid, and we further hold that Goodrich's claim to invalidate it is not time-barred.[FN1] Because we hold that the Apartment**\*1037** Trust is invalid and may therefore be disregarded, we need not address whether it is Michaels's alter ego.

> FN1. The district court remanded on the statute of limitations issue, noting that Goodrich had failed to argue before the bankruptcy court that the seven-year statute of limitations did not begin to run until Briones repudiated the trust. Although the bankruptcy court did not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

address that precise question, the parties sufficiently raised the issue—when the statute of limitations began to run—before the bankruptcy court, and the issue therefore is not new on appeal. Moreover, we note that "[w]e may consider an issue conceded or neglected below if the issue is purely one of law and the pertinent record has been fully developed," as is the case here. *United States v. Gabriel,* 625 F.2d 830, 832 (9th Cir.1980).

[2][3] "It is well-settled that a trust created for the purpose of defrauding creditors or other persons is illegal and may be disregarded." *In re Marriage of Dick,* 15 Cal.App.4th 144, 18 Cal.Rptr.2d 743, 752 (1993); *see also* Cal. Prob.Code § 15203 ("A trust may be created for any purpose that is not illegal or against public policy"). Properly designating a minor child as a beneficiary does not validate a trust that was created with an improper purpose. *See* 1A *Scott on Trusts* § 63(4th ed. 2001) ("Although the terms of the trust in themselves are perfectly lawful, the trust is illegal where the motive of the settlor for creating the trust is to defraud creditors or other persons"). Here, the bankruptcy court found that Michaels transferred the Kokee Woods stock simultaneously with the creation of the Apartment Trust and that the transfer "was made for the fraudulent purpose of avoiding the Debtors' creditors." Those findings are sufficient to establish that Michaels's purpose in creating the trust was to defraud creditors. The Apartment Trust is therefore an invalid trust.

[4][5][6][7] Moreover, even to the extent it alleges fraudulent transfer, Goodrich's claim is not time-barred by the seven-year statute of limitations set forth in California Civil Code § 3439.09(c).[FN2] If an express trust fails—if, for instance, it was formed for a fraudulent purpose—the trustee holds legal title to the property on a resulting trust for the trustor and his or her heirs. *See Bainbridge v. Stoner,* 16 Cal.2d 423, 106 P.2d 423, 429 (1940) (In Bank). "[T]he trustee of a resulting trust is

considered a voluntary trustee and ... the statute of limitations does not begin to run in favor of a voluntary trustee until he repudiates the trust." *Davenport v. Davenport Found.,* 36 Cal.2d 67, 222 P.2d 11, 16 (1950). Because the Apartment Trust is invalid, Briones is a voluntary trustee on a resulting trust for Michaels and his heirs. The statute of limitations did not begin to run until Briones repudiated the trust, that is, until he answered Goodrich's complaint and denied that the Apartment Trust's assets are property of the bankruptcy estate. We therefore conclude that Goodrich's claim is not time-barred, and we affirm the district court's judgment that the Apartment Trust is invalid.

> FN2. California Civil Code § 3439.09(c) states that "a cause of action with respect to a fraudulent transfer or obligation is extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred."

2. *The Grove Trust*

Goodrich also argues that Michaels is an equitable owner of the Grove Trust and that equitable ownership is sufficient to confer alter ego liability. The Debtors respond that the Grove Trust is not Michaels's alter ego because he is not its legal owner, and that allowing alter ego liability would constitute reverse piercing—that is, "pierc[ing] the corporate veil to reach corporate assets to satisfy a shareholder's personal liability"—which the California Court of Appeal has prohibited in the corporate context. *Postal Instant Press, Inc. v. Kaswa Corp.,* 162 Cal.App.4th 1510, 77 Cal.Rptr.3d 96, 97 (2008). In determining whether alter ego liability applies, we apply the law of the forum state. *Towe Antique Ford Found. v. I.R.S.,* 999 F.2d 1387, 1391 (9th Cir.1993). **\*1038** Under California law, the Grove Trust is Michaels's alter ego.

California recognizes alter ego liability where two conditions are met: First, where "there is such a unity of interest and ownership that the

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

individuality, or separateness, of the said person and corporation has ceased;" and, second, where "adherence to the fiction of the separate existence of the corporation would ... sanction a fraud or promote injustice." *Wood v. Elling Corp.,* 20 Cal.3d 353, 142 Cal.Rptr. 696, 572 P.2d 755, 761 n. 9 (1977). Factors suggesting an alter ego relationship include "[c]ommingling of funds and other assets [and] failure to segregate funds of the separate entities ...; the treatment by an individual of the assets of the corporation as his own ...; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities ...; [and] the diversion [of assets from a corporation by or to a] stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets ... between entities so as to concentrate the assets in one and the liabilities in another." *Associated Vendors, Inc. v. Oakland Meat Co., Inc.,* 210 Cal.App.2d 825, 26 Cal.Rptr. 806, 813–15 (1962) (citations omitted). California courts have applied the alter ego doctrine to trusts. *See, e.g., Torrey Pines Bank v. Hoffman,* 231 Cal.App.3d 308, 282 Cal.Rptr. 354, 359 (1991) (holding guarantors of a family trust liable for the trust's debts under an alter ego theory).

[10] We first address the Debtors' reverse piercing argument. As they correctly note, the California Court of Appeal held in *Postal Instant Press, Inc.* that "a third party creditor may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability." 77 Cal.Rptr.3d at 97. We "must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." *Owen By and Through Owen v. United States,* 713 F.2d 1461, 1464 (9th Cir.1983) (citations and internal quotation marks omitted). In the context of trusts, however, the California Supreme Court has allowed alter ego claims where a trust is alleged to be a debtor's alter ego. Thus, in *Wood v. Elling Corp.,* the California Supreme Court gave leave to amend a complaint to assert alter ego claims, concluding,

"If it were alleged and proven that the two trusts in question were themselves alter egos of the [defendants], those trusts would essentially drop out as independent legal entities." 572 P.2d at 762. In the absence of further guidance from California courts, therefore, we cannot extend the prohibition on reverse piercing to the trust context.

Second, we address the Debtors' contention that legal ownership is an absolute requirement for alter ego liability. No California case explicitly addresses the question, but in *Hickey* the Ninth Circuit interpreted California law as implying that ownership is a prerequisite. 322 F.3d at 1128–29. *Hickey* addressed the ownership requirement in the corporate context, concluding that stock ownership is a requirement for the imposition of alter ego liability. *Id.* In so concluding, however, *Hickey* cited with approval *Firstmark Capital Corp. v. Hempel Financial Corp.,* an earlier Ninth Circuit opinion applying California law and holding that a wife's "community property interest in [her husband's] stock holdings ... is sufficient to satisfy the ownership requirement." 859 F.2d 92, 94 (9th Cir.1988). *Hickey* therefore did not foreclose the possibility that equitable ownership might be sufficient in some contexts.

California case law suggests that equitable ownership is sufficient. The California **\*1039** Supreme Court has noted that an individual's expectation that he would receive shares of a corporation "supports an inference that he was an equitable owner" and justifies imposition of alter ego liability. *Minton v. Cavaney,* 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473, 475 (1961). And in *Troyk v. Farmers Group, Inc.,* the California Court of Appeal imposed alter ego liability on a managing agent and attorney-in-fact although it did not own the interinsurance exchange at issue. 171 Cal.App.4th 1305, 90 Cal.Rptr.3d 589, 620 (2009). Legal ownership was not necessary because, although "[a]n insurance exchange is 'owned' by the subscribers, ... given that the subscribers are required to appoint the attorney-in-fact as

626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668
**(Cite as: 626 F.3d 1032)**

managerial agent, the 'ownership' element of the alter ego doctrine is not applicable in this context." *Id.* at 620 n. 27 (citation and internal quotation marks omitted). In essence, the managing agent was the equitable owner. *See also Sonora Diamond Corp. v. Superior Court,* 83 Cal.App.4th 523, 99 Cal.Rptr.2d 824, 836 (2000) (where the alter ego doctrine applies, "courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners").

[11][12] In the context of trusts, moreover, equitable interest is traditionally sufficient to confer ownership rights. Thus, under California law, trust beneficiaries hold an equitable interest in trust property and are " 'regarded as the real owner[s] of [that] property.' " *Steinhart v. County of L.A.,* 47 Cal.4th 1298, 104 Cal.Rptr.3d 195, 223 P.3d 57, 72 (2010) (alterations in original; citation omitted); *see also* 76 Am.Jur.2d *Trusts* § 258 (2010) (the creation of a trust places legal title in the trustee and equitable title in the beneficiary; courts will enforce a beneficiary's equitable interest). We conclude that, under California law, equitable ownership in a trust is sufficient to meet the ownership requirement for purposes of alter ego liability.

Here, Michaels is an equitable owner of the Grove Trust because he acted as owner of the trust and its assets. *See In re Marriage of Dick,* 15 Cal.App.4th 144, 18 Cal.Rptr.2d at 752–53 (inferring from husband's use of assets not in his name that, "notwithstanding his absence of legal title, husband controlled ownership of [the assets] through the fiction of a trust"). Having used his own assets and a corporation that the bankruptcy court termed "nothing but a shell" to acquire the Grove Lots, Michaels continued to act as owner of the trust assets and as trustee; Briones, the named trustee, "had no role nor took any action ... other than to write checks as demanded by Michaels." Michaels also acted as a beneficiary of the Grove Trust, which purchased a home where he lived rent-

free, paid maintenance expenses for another home where he lived, again rent-free, and paid Michaels at least $105,000 in unexplained fees. The trusts also paid for a wedding, at Michaels's request, and for a life insurance policy with an unknown beneficiary. Those facts suggest that Michaels is an equitable owner of the Grove Trust.

[14] Given that Michaels's equitable ownership is sufficient to meet the ownership requirement, the bankruptcy court did not clearly err in finding an alter ego relationship. *See Towe Antique Ford Found.,* 999 F.2d at 1391 (alter ego determinations are typically findings of fact reviewed for clear error). As the bankruptcy court found, Michaels "dominated and controlled all decisions of the Grove Trust." He also received payments from the trusts without documentation and to avoid a creditor and diverted assets to the detriment of his creditors, using his assets **\*1040** to acquire the Grove Lots at a time when he was insolvent. Given that the bankruptcy court called the acquisition of the Grove Lots "a fraud on the creditors of the Debtors," failure to find alter ego liability would sanction a fraud or promote injustice. The bankruptcy court did not err in finding that the Grove Trust is Michaels's alter ego.

### III. CONCLUSION

We therefore hold that the Apartment Trust is an invalid trust and that Goodrich's action to invalidate it is not time-barred. We also hold that the Grove Trust is Michaels's alter ego.

Costs are awarded to appellant Goodrich.

AFFIRMED IN PART AND REVERSED IN PART.

C.A.9 (Cal.),2010.
In re Schwarzkopf
626 F.3d 1032, 53 Bankr.Ct.Dec. 266, 10 Cal. Daily Op. Serv. 14,590, 2010 Daily Journal D.A.R. 17,668

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

▷

United States Court of Appeals,
Eleventh Circuit.
SHADES RIDGE HOLDING COMPANY, INC.,
Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-
Appellee.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sam A. FIORELLA and Shades Ridge Holding
Company, Inc., Defendants-Appellants.

No. 88-7085.
Aug. 10, 1989.
As Amended on Denial of Rehearing Sept. 29,
1989.

Holding company instituted a quiet title action,
and Government instituted a foreclosure action to
foreclose tax liens and judgment liens relating to
the tax liability of taxpayer against property titled
to holding company. The United States District
Court for the Northern District of Alabama, Nos.
CV85-PT-2526-S, CV86-PT-1415-S, Robert B.
Propst, J., entered a decree of foreclosure, and
taxpayer and holding company appealed. The Court
of Appeals, Roney, Chief Judge, held that: (1)
taxpayer waived his right to raise the affirmative
defense of res judicata by failing to raise it in tax
court; (2) earlier tax court judgments were not a bar
to the nominee or transferee claim proceeding
against holding company; (3) the action was not
barred by a plea agreement taxpayer entered with
the Government in an earlier prosecution for federal
income tax evasion; and (4) that when unpaid
assessment is reduced to judgment, tax lien is
incorporated but not merged in the judgment.

Affirmed.

Opinion, 880 F.2d 342, superseded.

West Headnotes

**[1] Internal Revenue 220 ☞4687**

220 Internal Revenue
  220XXI Assessment of Taxes
    220XXI(F) Review of Tax Court Decisions
      220XXI(F)2 Decisions Reviewable, Right
of Review, and Presentation of Grounds of Review
        220k4687 k. Presentation and
Reservation of Grounds of Review. Most Cited
Cases

Taxpayer waived right to raise affirmative
defense of res judicata to preclude district court's
reduction to judgment of income tax liabilities
determined in tax court decisions; taxpayer failed to
raise res judicata defense in tax court. Tax Court
Rule 39, 26 U.S.C.A. foll. § 7453.

**[2] Internal Revenue 220 ☞4664.1**

220 Internal Revenue
  220XXI Assessment of Taxes
    220XXI(E) Review by Tax Court
      220k4664 Decisions and Orders
        220k4664.1 k. In General. Most Cited
Cases
(Formerly 220k4664)

Tax court judgments in regard to holding
company were not res judicata as to Government's
action to collect taxpayer's tax liability from
holding company's assets by alter ego and
fraudulent conveyance or use cause of action.

**[3] Internal Revenue 220 ☞4857**

220 Internal Revenue
  220XXV Collection
    220XXV(B) Levy or Distraint
      220k4857 k. Property Subject to Distraint.
Most Cited Cases

Property of nominee or alter ego of taxpayer is
subject to collection of taxpayer's tax liability; issue
under either state or federal law depends upon who
has "active" or "substantial" control.

**[4] Internal Revenue 220 ☞4847**

┌─────────────┐
│  APPENDIX   │
│      4      │
└─────────────┘

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

220 Internal Revenue
  220XXV Collection
    220XXV(A) In General
      220k4846 Collection by Corporations and Others
        220k4847 k. In General. Most Cited Cases

    Whether corporation is taxpayer's nominee turns on control taxpayer exercises over nominee and its assets, use of corporate funds to pay taxpayer's personal expenses, and family relationship, if any, between taxpayer and corporate officers.

**[5] Internal Revenue 220 ⚖4911**

220 Internal Revenue
  220XXVI Actions for Taxes
    220XXVI(F) Evidence
      220k4911 k. Weight and Sufficiency. Most Cited Cases

    For purposes of Government's action to collect taxpayer's tax liability from holding company's assets, evidence supported finding that holding company was taxpayer's "alter ego/nominee," even though there was no evidence that taxpayer owned stock in holding company; evidence indicated that holding company's primary source of income was taxpayer's gambling earnings, and that holding company's income and assets were used for personal benefit of taxpayer and his family.

**[6] Judgment 228 ⚖634**

228 Judgment
  228XIV Conclusiveness of Adjudication
    228XIV(A) Judgments Conclusive in General
      228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases

    Res judicata is not doctrine limiting evidence, but rule preventing claim tried in one suit from being relitigated in second suit.

**[7] Internal Revenue 220 ⚖4844**

220 Internal Revenue
  220XXV Collection
    220XXV(A) In General
      220k4844 k. Compromise and Settlement of Liability. Most Cited Cases

    In Government's action to collect taxpayer's tax liability from assets of holding company under alter ego/nomination theory, earlier final judgment entered against taxpayer pursuant to compromise and settlement did not preclude admission of evidence indicating alter ego or fraudulent conveyance prior to year of that judgment, despite taxpayer's argument that judgment was res judicata as to any subsequent proceeding involving same claims and same tax years; in earlier action, court made no express finding as to alter ego/fraudulent conveyance theories, and there was no such finding implicit in judgment entered pursuant to compromise among parties.

**[8] Criminal Law 110 ⚖273.1(2)**

110 Criminal Law
  110XV Pleas
    110k272 Plea of Guilty
      110k273.1 Voluntary Character
        110k273.1(2) k. Representations, Promises, or Coercion; Plea Bargaining. Most Cited Cases

    Government's action to collect taxpayer's tax liability from assets of holding company under alter ego/nominee theory was not barred by taxpayer's earlier plea agreement with Government in tax evasion prosecution, despite taxpayer's argument that, under terms of plea agreement, Government agreed to absolve holding company from any liability for taxpayer's tax debts if holding company guaranteed payments of $200,000; plea agreement contemplated separate settlements of taxpayer's criminal, and taxpayer's and holding company's civil liability.

**[9] Internal Revenue 220 ⚖4800**

220 Internal Revenue
  220XXIII Liens

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

220k4794 Actions to Enforce Lien
    220k4800 k. Judgment and Review. Most Cited Cases

When unpaid assessment is reduced to judgment; tax lien is incorporated, but not merged, in judgment; tax lien survives judgment, and thus can be enforced at any time.

**\*726** Vowell, Meelheim & McKay, PC, Richard A. Meelheim, Samuel R. McCord, Birmingham, Ala., for plaintiff-appellant.

Frank W. Donaldson, U.S. Atty., Caryl Privett, Asst. U.S. Atty., Birmingham, Ala., Gary R. Allen, Chief, Appellate Sec., William Rose, Jr., Joan Oppenheimer, William Estabrook, Asst. Attys. Gen., Appellate Section, U.S. Dept. of Justice, Washington, D.C., for U.S.

Appeal from the United States District Court for the Northern District of Alabama.

**\*727** Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.

RONEY, Chief Judge:

This appeal arises from two consolidated cases: a quiet title action commenced by Shades Ridge Holding Company, Inc. (Shades Ridge) and a foreclosure action by the Government to foreclose tax liens and judgment liens relating to the tax liability of Sam Fiorella against property titled to Shades Ridge. The district court entered a decree of foreclosure against three parcels of real property, holding that Shades Ridge was the alter ego and fraudulent transferee of Sam Fiorella. The total amount foreclosed was approximately $1,600,000, comprised of a consolidated judgment against Fiorella in *United States v. Fiorella,* Nos. CV-64-391 and CV-65-7745 (N.D.Ala.1968), totalling approximately $1,000,000 for tax years 1956 through 1963, and a judgment entered in this case for approximately $590,000 for tax years 1969 through 1976.

Shades Ridge argues six points on appeal relating to the district court's failure to give proper effect to prior litigation, the insufficiency of the evidence to prove alter ego and fraudulent conveyance, and whether one of the prior judgments had been satisfied as a matter of law. This opinion will discuss the arguments seriatim, and detail facts as are necessary in the decision of each.

Briefly, the Government contends that since 1957, taxpayer has run a gambling operation offering his customers poker, sports betting, dice games, and blackjack. This gambling business has been so lucrative it has generated income resulting in taxpayer having more than $4 million in unpaid federal tax liabilities. Taxpayer and Shades Ridge have been litigating taxpayer's tax liability since 1964.

I. *Res Judicata as to 1987 Tax Court Decisions*

    [1] Appellants argue that a 1977 district court judgment precluded by res judicata the reduction to judgment of income tax liabilities determined in 1987 tax court decisions. Although the district court, after an evidentiary hearing, ruled the prior litigation did not involve the same causes of action and therefore was not res judicata, it also ruled that taxpayer waived his right to raise the affirmative defense of res judicata in subsequent proceedings when he failed to raise it in tax court, when the assessments were determined. We affirm the district court on this legal waiver ground, and need not discuss the details of the complex litigation.

The rule governing the pleading of affirmative defenses in tax court, requires that

A party shall set forth in his pleading any matter constituting an avoidance or affirmative defense, including res judicata, collateral estoppel, estoppel, waiver, duress, fraud, and the statute of limitations. A mere denial in a responsive pleading will not be sufficient to raise any such issue.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

Rule 39, 6 I.R.C. foll. § 7453.

The rule requires that affirmative defenses, such as res judicata must be raised initially in tax court. *Brutsche v. Commissioner,* 585 F.2d 436 (10th Cir.1978) (doctrine of election as affirmative defense). *See also* R. 34(b)(4) I.R.C. foll. § 7453 (tax court petition must contain clear and concise assignments of every error allegedly committed by the Commissioner in his deficiency determination).

Fiorella petitioned the tax court for a redetermination of the tax deficiency, challenged the deficiency in several respects, but did not assert then that the assessments were precluded by res judicata. Taxpayer argues that even though the defense should have been raised in tax court, it is not waived because it was raised in district court when the Government sought to reduce the assessment to judgment. The gist of taxpayer's argument is that a final judgment was not entered in the case until the district court entered judgment; res judicata was raised in the district court; thus, it was timely raised. Taxpayer cited no case either in his briefs or during oral argument in support of this proposition, **\*728** nor has this court found any cases to support this argument.

This same procedure was followed by a taxpayer and rejected in *United States v. Wynshaw,* 516 F.Supp. 785 (S.D.N.Y.1981), *aff'd on other grounds,* 697 F.2d 85 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 87, 78 L.Ed.2d 96 (1983). In *Wynshaw,* the Government sought to reduce to judgment income tax assessments against taxpayer. Taxpayer raised a defense in district court that she had not raised in the prior tax court proceeding. The court granted the Government's summary judgment motion, finding that taxpayer was "attempting to litigate an issue which is without doubt a matter that could have been offered to challenge the assessment in Tax Court." *Id.* at 789.

Taxpayer's rationale that the tax court decision is not a final judgment is equally without merit. A tax court decision is considered final upon the

affirmance or dismissal after a notice of appeal or the expiration of that time. I.R.C. § 7481(a)(1).

Taxpayer may be attempting to assert that the district court has authority to hear taxpayer's defense in the first instance pursuant to I.R.C. section 7403, which provides that

> [t]he court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property....

I.R.C. § 7403(c). The cases holding that the taxpayer "may challenge the underlying merits of the assessment" in district court, however, do not involve prior Tax Court action, and are cases where the litigants' first opportunity to challenge the assessment in any court did not occur until the district court foreclosure action. *United States v. Lease,* 346 F.2d 696, 698 (2d Cir.1965); *United States v. Connor,* 291 F.2d 520, 527 (2d Cir.1961); *United States v. Mauro,* 243 F.Supp. 413 (S.D.N.Y.1965); *United States v. Camejo,* 666 F.Supp. 1542 (S.D.Fla.1987).

## II. *1982 Tax Court Decisions*

[2] Taxpayer contends that the 1982 tax court decisions in *Shades Ridge v. Commissioner,* Nos. 7284-77 and 12290-78 (T.C. Nov. 8, 1982) are res judicata as to the Government's present attempt to collect Fiorella's tax liability from Shades Ridge's assets by an alter ego and fraudulent conveyance or use cause of action. Essentially, Fiorella argues that the cause of action the Government now asserts against Shades Ridge was asserted in the 1982 tax court cases against Shades Ridge. Taxpayer asserts that the Government was required to pursue its claims against Shades Ridge as Fiorella's transferee at the same time it brought an action to establish Shades Ridge's tax liability.

The district court in its Memorandum Opinion entered November 12, 1987, correctly held that the 1982 Tax Court judgments are not a bar to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

nominee or transferee claim proceeding in this case against Shades Ridge. *Shades Ridge Holding Co. v. United States,* No. CV85-PT-2526-S (N.D.Ala. Nov. 12, 1987). It is not necessary to repeat that carefully reasoned opinion.

III. *Nominee/Fraudulent Transferee Claims*

Fiorella contends that the Government failed to offer sufficient evidence to support the district court's decision that Shades Ridge was the alter ego/nominee of Fiorella.

[3] The district court applied the correct principles of law. Property of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer's tax liability. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350-51, 97 S.Ct. 619, 627-28, 50 L.Ed.2d 530 (1977). Although the district court found it unclear as to whether state or federal law governs this issue, the standards are so similar that the distinction is of little moment. *See United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 690 n. 5 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). The issue under either state or federal law depends upon who has "active" or "substantial" control. **\*729** *Valley Finance, Inc. v. United States,* 629 F.2d 162, 172 (D.C.Cir.1980), *cert. denied sub nom., Pacific Development, Inc. v. United States,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981).

[4] Whether a corporation is a taxpayer's nominee turns on: (1) the control taxpayer exercises over the nominee and its assets; (2) the use of corporate funds to pay taxpayer's personal expenses; and (3) the family relationship, if any, between the taxpayer and the corporate officers. *Valley Finance, Inc. v. United States,* 629 F.2d at 171-72; *Loving Saviour Church v. United States,* 728 F.2d 1085, 1086 (8th Cir.1984).

[5] Applying these factors to the instant case, the district court in its 42-page Findings of Fact and Conclusions of Law extensively outlined the history of the relationship between Fiorella and his family members with Shades Ridge. *Shades Ridge*

*Holding Co. v. United States,* No. CV85-PT-2526-S (N.D.Ala. Dec. 17, 1987). The court found that Fiorella "was ever present and ever involved in the business decisions of Shades Ridge and moved his family members in and out of control at will" and that there "is no family member, other than Fiorella, who truly controlled Shades Ridge at any time." The district court's findings are not clearly erroneous.

The fact that there is no evidence that Fiorella owned stock in Shades Ridge does not affect the district court's ruling. The absence of stock ownership is not dispositive. *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.,* 483 F.2d 1098, 1104 (5th Cir.1973) (absence of stock ownership in corporation does not preclude application of the instrumentality rule "where action and total control has been otherwise established"). That no one testified that Fiorella controlled Shades Ridge is of no consequence in the view of the ample evidence

-that Shades Ridge's primary source of income was Fiorella's gambling earnings,

-that Shades Ridge's income and assets were used for the personal benefit of taxpayer and his family,

-that none of Fiorella's family members actually controlled Shades Ridge,

-that Fiorella was present at the office on a daily basis, participated in all decisions concerning Shades Ridge property, and attended all meetings regarding its corporate decisions,

-that Fiorella even assisted in company decisionmaking while he served time in prison for income tax evasion.

The record reflects substantial evidence to support the district court's decision.

IV. *Objection to Admission of Evidence Predating 1968*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

Fiorella contends that the district court erred in allowing the admission of evidence indicating alter ego or fraudulent conveyance prior to 1968, because a judgment entered against him that year disposed of claims based on the same theories involving transactions prior to 1968, so that it was res judicata as to any subsequent proceeding involving the same claims and the same tax years.

That was a final judgment entered pursuant to a compromise and settlement between the parties, in the amount of $1,004,552.56, plus interest. *United States v. Fiorella,* No. 64-391 (N.D.Ala. Jan. 3, 1968). The court also ordered, among other things, that shares of stock of Shades Ridge be discharged from any federal tax liens, and that the actions be dismissed with prejudice as to Shades Ridge.

[6] Since neither res judicata nor collateral estoppel can be used to exclude evidence used in a previous action, the district court properly considered Fiorella's argument based on the relevance or remoteness of the pre-1968 evidence. *Shades Ridge Holding Co. v. United States,* No. CV85-PT-2526-S (N.D.Ala. Nov. 12, 1987). Res judicata is not a doctrine limiting evidence, but a rule preventing a *claim* tried in one suit from being relitigated in a second suit. *See Thomas v. Commissioner,* 324 F.2d 798, 799 (5th Cir.1963). The doctrine of collateral estoppel does not bar the introduction of evidence.

[7] *Thomas v. Commissioner,* 324 F.2d 798 (5th Cir.1963), cited by Fiorella, is distinguishable *830 from the instant case. In *Thomas,* the issue was whether taxpayers were entitled to deduct losses they sustained during 1956-58 for the operation of a farm they contended was run as a for-profit business. This Court held that the tax court had to recognize the binding effect of a prior judgment based on a special jury verdict that expressly found that plaintiffs had operated the farm for profit in 1955. Here, the 1968 court made no express finding as to the alter ego/fraudulent conveyance theories nor is there any such finding implicit in the judgment entered pursuant to a

compromise among the parties.

The government is probably correct in arguing that any error in admitting the evidence would be harmless, since the evidence of facts and events occurring after January 3, 1968 is sufficient to support the finding that Shades Ridge was taxpayer's alter ego.

### V. *Plea Bargain Agreement*

[8] Fiorella argues that this action is barred by a plea agreement he entered with the Government in 1976. On December 17, 1975, a federal grand jury indicted Fiorella for conspiracy to evade the payment of federal taxes by concealing assets, and for federal income tax evasion for calendar tax years 1969 through 1972. On April 14, 1976, the United States and Fiorella entered into a plea bargain agreement with respect to these charges. Also on April 14, 1976, under the terms of the plea bargaining agreement, Fiorella was sentenced to one year and one day at the Federal Correctional Institution at Maxwell Field, Montgomery, Alabama and agreed to pay $200,000 in settlement of outstanding civil judgments.

Fiorella contends that, under the terms of the agreement, the Government agreed to absolve Shades Ridge from any liability for Fiorella's tax debts if Shades Ridge guaranteed the payment of the $200,000. Shades Ridge did guarantee payment in the form of a mortgage and a note. Fiorella satisfied his part of the plea bargain by serving the time in prison.

The district court in its Findings of Fact and Conclusions of Law entered November 18, 1986, correctly interpreted the agreement as contemplating separate settlements of Fiorella's criminal and Fiorella and Shades Ridge's civil liability. *Shades Ridge Holding Co. v. United States,* No. CV85-PT-2526-S (N.D.Ala. Nov. 18, 1986). The following language was in the agreement:

It is further agreed and understood that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

888 F.2d 725, 64 A.F.T.R.2d 89-5426
**(Cite as: 888 F.2d 725)**

acceptance of *this offer* by the United States completely absolves and releases the present assets of Shades Ridge Holding Company, Inc. from *any and all liability for taxes owed by Sam A. Fiorella up to the date of this agreement.*

The district court's finding that the Government rejected the offer as to the civil action shows that Shades Ridge was not absolved from liability by the agreement. Any ambiguity is resolved by the transcript of the sentencing hearing in which the court asked Fiorella's attorney, Mr. Bowen, whether refusal of the civil authorities to accept the settlement of the civil liabilities would in any way affect the agreement with respect to the criminal cases, and Bowen stated no, whether they accepted had no bearing on the validity of the proceedings.

Because this issue is decided on the factual basis of the agreement itself, it is not necessary to reach the question whether the Assistant United States Attorney had authority to compromise Fiorella's tax liability.

VI. *Enforceability of January 1968 Judgment*

The last issue addressed by the parties concerns whether the district court erred in denying Fiorella's Motion for Relief From Judgment or in the Alternative to Alter or Amend the Judgment on the ground that the January 3, 1968 judgment was not enforceable after January 3, 1988, as a matter of state law. Another panel of this Court affirmed the district court's holding that it would be a violation of state law to revive the 1968 judgment beyond January **\*731** 3, 1988. *United States v. Fiorella,* 869 F.2d 1425 (11th Cir.1989).

[9] That prior panel did not reach the question of whether the tax lien underlying the January 3, 1968 judgment remains enforceable, as that issue was not properly before it. The district court did not err in denying Fiorella's motion. When an unpaid assessment is reduced to judgment, the tax lien is incorporated, but not merged, in the judgment. Since the tax lien survives the judgment, it can be enforced at any time. *See United States v. Overman,*

424 F.2d 1142, 1147 (9th Cir.1970); *United States v. Hodes,* 355 F.2d 746 (2d Cir.1966), *cert. dismissed,* 386 U.S. 901, 87 S.Ct. 784, 17 L.Ed.2d 779 (1967).

AFFIRMED.

C.A.11 (Ala.),1989.
Shades Ridge Holding Co., Inc. v. U.S.
888 F.2d 725, 64 A.F.T.R.2d 89-5426

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.